UNITED STATES of America,
Plaintiff–Appellee,

v.

Christopher J. MAHAN, Defendant–
Appellant.

No. 98–6014.

United States Court of Appeals,
Sixth Circuit.

Submitted Aug. 13, 1999

Decided Aug. 31, 1999

Randy W. Ream, Asst. U.S. Attorney (briefed), Terry M. Cushing (briefed), Asst. U.S. Attorney, Office of the U.S. Atty., Louisville, KY, for Plaintiff–Appellee.

Mark Edwards (briefed), Megibow & Edwards, Paducah, KY, for Defendant–Appellant.

Before: KEITH, BOGGS, and CLAY, Circuit Judges.

## OPINION

CLAY, Circuit Judge.

Defendant, Christopher J. Mahan, appeals from his conviction and sentence for conspiracy against the civil rights of oth-

ers, in violation of 18 U.S.C. § 241, and intimidation and interference with a family's occupancy of a dwelling because of race, in violation of 18 U.S.C. § 2 and 42 U.S.C. § 3631(a). Mahan's conviction stems from his participation in a conspiracy to oust an African–American family from their home by littering their yard with approximately one hundred copies of a hate flyer threatening physical violence.

On appeal, Mahan first contends that the district court erred in denying his motion to suppress his statement to federal authorities admitting his role in this scheme, on grounds (i) that he was not advised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to questioning; and (ii) that the interviewer engaged in coercive conduct, thus rendering Mahan's statement involuntary. Mahan next maintains that the district court committed clear error in sustaining the government's objection to his peremptory strike of the only African–American prospective juror. Finally, Mahan objects to his sentence under the federal sentencing guidelines, arguing that the district court wrongly denied his requests for a "role in the offense" sentence level reduction pursuant to U.S.S.G. § 3B1.2, and for an "acceptance of responsibility" reduction pursuant to U.S.S.G. § 3E1.1. For the reasons set forth below, we **AFFIRM** Mahan's conviction and sentence in all respects.

## I.

Early in the morning on September 12, 1997, an African–American family noticed what appeared to be trash in the yard of their Murray, Kentucky, home. The mother sent her children out to clean it up, and the children returned with approximately one hundred copies of a hate flyer stating:

WE DON'T KNOW IF YOU HAVE REALIZED THIS OR NOT, BUT YOU AND YOUR FAMILY ARE NIGGERS. WE, AS MEMBERS OF A WHITE SOCIETY, DO NOT CONDONE THE IDEA OF HAVING NIGGERS LIVING IN OUR COMMUNITY. WE ARE NOT HAPPY TO SEE OUR PROPERTY VALUES PLUMMET TO AN ALL TIME LOW. WE HAVE WORKED HARD TO BRING UP OUR PROPERTY VALUE WITH STRICT COMMUNITY RESTRICTIONS. SINCE THE REAL ESTATE APPRAISERS HAVE LEARNED THAT NIGGERS LIVE IN OUR COMMUNITIES, WE HAVE LOST THOUSANDS OF DOLLARS ON THE RESALE VALUE OF OUR HOMES. WHOEVER GAVE YOU THE IDEA THAT IT IS ALRIGHT TO LIVE ON [THIS STREET] IS SADLY MISTAKEN. THIS ABOMINATION WILL NOT BE TOLERATED. MOVE BACK TO THE NIGGER SECTION IN TOWN, TO ANOTHER STATE OR COMMUNITY, OR TO AFRICA WHERE YOU REALLY BELONG. WE FEEL THAT IT IS OUR RIGHTS AS SOUTHERNERS TO TAKE THIS MATTER IN TO OUR OWN HANDS IF IT IS NECESSARY. WE WOULD HAVE MADE YOU AWARE OF THIS EARLIER, BUT WE WANTED TO NOTIFY ALL OF OUR FOLLOWERS OF THE SITUATION SO EVERYONE WOULD BE READY ON A MOMENT'S NOTICE. NOW THAT THIS IS COMPLETED, YOU HAVE EXACTLY THIRTY DAYS TO VACATE THE PREMISES. CONTACT THE POLICE IF YOU THINK THIS WILL MAKE YOU REST EASIER AT NIGHT, BUT NOT EVEN THE POLICE CAN PROTECT YOU FROM OUR WRATH. WE WILL SEE TO IT THAT YOU AND YOUR FAMILY ARE PERMANENTLY REMOVED FROM YOUR EYESORE OF A HOME, THE EASY WAY OR THE HARD WAY. WE PREFER THE HARD WAY. THE CHOICE IS YOURS. JUST REMEMBER THAT YOU HAVE THIRTY DAYS AND NOT A MOMENT LONGER. WE WILL

BE WATCHING YOUR EVERY MOVE, DAY AND NIGHT. TOO MUCH TIME ON YOUR HANDS MAKES FOR ONE DEADLY ADVERSARY, AND WE HAVE ALL THE TIME IN THE WORLD. SO TRY NOT TO RILE OUR ANIMOSITY. THIS IS THE NEW WORLD ORDER FOR ENFORCEMENT, KNOWN AS THE LAST RITES, GIVING YOU FAIR WARNING. GO HOME!!!

Sincerely,

The Last Rites

The mother went to work later that morning but was so upset that she left work and took the flyers to the office of Calloway County Sheriff Stan Scott. On September 13, 1997, a local newspaper printed a story about the hate flyers placed in the family's yard, and published a copy of the flyer. One of Mahan's co-workers at the local Mattel Toy factory recognized the flyer as something Mahan had shown him and reported the incident to Sheriff Scott.

On September 17, 1997, FBI Special Agent Sean Walsh, accompanied by Sheriff Scott, interviewed Mahan at Mattel. Agent Walsh and Sheriff Scott followed Mattel's security procedures, and Mahan was brought from his work station to a conference room for an interview. Agent Walsh did not inform Mattel officials that Mahan was a suspect, telling them only that he might have some information about the case. The interview commenced in the conference room, but Mahan followed Agent Walsh to another office when other employees needed to use the room.

Agent Walsh told Mahan that he was an FBI agent, and that he understood that Mahan might have some information about the hate flyers. Agent Walsh at no time advised Mahan of his *Miranda* rights. At Mahan's request, the Mattel representative left the meeting and Sheriff Scott left to conduct other interviews. Mahan did not ask to leave at any point, and Agent Walsh did not tell him that he could not

go. The doors to both of the interview rooms remained unlocked at all times.

After initially explaining the presence of the flyer at work by stating that he had seen it along the roadside and stopped to pick one up, Mahan eventually acknowledged that he had copied the flyers at Mattel for his friends Barry Dunn and Brian Porter. Mahan stated that he had been present when Porter and Dunn first discussed their plan to place copies of the hate flyers on the family's lawn in an effort to force the family to abandon their home. Mahan identified Dunn, who lived near the family, as the one who initiated the scheme. Mahan stated that Porter, who had access to hate literature, had supplied the original of the flyer, which Mahan had seen at Porter's residence before he was asked to copy it. Mahan said that he had been careful not to get his fingerprints on the flyers and admitted that it was he who had concocted the alibi repeated by himself and later by Dunn that the flyers had only been found along the side of the road. Finally, Mahan admitted that he, Dunn and Porter had driven by the family's home in July 1997 and yelled "nigger" in an attempt to scare the family. However, Mahan stated that he was not present when Dunn scattered the copies of the hate flyer throughout the family's yard.

The interview lasted approximately an hour and thirty-five minutes, including the time spent changing rooms. Mahan was not arrested at the conclusion of the interview, and instead returned to work. When Mahan asked Agent Walsh what would happen to him (*i.e.*, would he go to jail), Walsh replied that the United States Attorney's office would make the decision on whether to prosecute.

Sheriff Scott and Agent Walsh attempted to interview Porter later that day, but Porter at that time refused to cooperate. However, Porter's girlfriend admitted delivering a copy of the hate flyer to Mahan. Agent Walsh then interviewed Dunn at his home, where he fully admitted his role in the conspiracy, including tossing the flyers

in the family's yard. After learning that he had already been implicated in the scheme, Porter contacted Agent Walsh on September 18, 1997, and gave his statement. Porter admitted to participating in discussions with Mahan and Dunn to scare the family, and to supplying the hate flyer to Mahan for copying so that Dunn could place these copies in the family's yard.

On December 4, 1997, Mahan, Dunn and Porter were named in a two-count indictment charging: (i) a conspiracy to deprive an African–American family of their constitutional right to hold and occupy a dwelling without injury, intimidation, or interference on account of race and color, in violation of 18 U.S.C. § 241; and (ii) willful intimidation and interference with the family in order to intimidate them from occupying their home without discrimination on account of color through the distribution of printed material placed in their yard, in violation of 42 U.S.C. § 3631(a) and 18 U.S.C. § 2.

Dunn and Porter subsequently pleaded guilty to both counts of the indictment. However, Mahan opted for trial by jury. Before trial, Mahan moved to suppress his statements to Agent Walsh, claiming that he had not been advised of his *Miranda* rights even though he had been subjected to custodial interrogation. This motion was denied. In addition, prior to the seating of the trial jury, Mahan exercised a peremptory strike against the panel's only black juror. The district court sustained the government's objection to the strike, finding that it had not been exercised for a race-neutral reason. The case subsequently proceeded to trial and the jury returned a guilty verdict on both counts. At sentencing, Mahan requested a "role in the offense" reduction pursuant to U.S.S.G. § 3B1.2 and an "acceptance of responsibility" reduction pursuant to § 3E1.1. The district court denied both requests and sentenced Mahan, in part, to eighteen months imprisonment. This appeal followed.

## II.

Mahan first challenges the district court's denial of his motion to suppress the statement he made to FBI Agent Walsh, on grounds (i) that he had not been informed of his Miranda rights even though he had been subjected to custodial interrogation; and (ii) that his statement was involuntary because it was the result of psychological coercion. We conclude that the district court properly denied Mahan's suppression motion.

### A.

■ We reject Mahan's claim that *Miranda* warnings were required prior to his questioning by Agent Walsh. "[T]he issue of whether a suspect is 'in custody,' and therefore entitled to Miranda warnings, presents a mixed question of law and fact qualifying for independent review." *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). For an individual to be "in custody," there must be "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson*, 516 U.S. at 112, 116 S.Ct. 457 (citation and internal quotation omitted). In determining whether a suspect is "in custody" for purposes of applying the *Miranda* doctrine, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *See also Thompson*, 516 U.S. at 112, 116 S.Ct. 457 (stating that the custody determination hinges upon whether, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave").

■ We believe that the circumstances surrounding Mahan's interrogation would not lead a reasonable person to believe that he was under formal arrest or restrained in his freedom of movement to the degree associated with formal arrest. *Miranda* warnings are not required "simply

because ... the questioned person is one whom the police suspect." *United States v. Warner*, 971 F.2d 1189, 1201 (6th Cir. 1992) (citations omitted). Notably, Agent Walsh never communicated any threat of arrest to Mahan, who simply returned to work upon conclusion of the interview. Moreover, Mahan was never told that he was not free to go; indeed, both interview rooms were unlocked and Mahan sat in the chair closest to the door. When Mattel employees needed to use the first conference room, Mahan voluntarily accompanied Agent Walsh to another room to complete the interview. His freedom of movement was thus unrestrained throughout the interview, which lasted only an hour and a half—including the time spent changing rooms. Finally, Agent Walsh at no time made any show of force or brandished a firearm or handcuffs, or any other equipment ordinarily associated with formal arrest or custody.

In sum, Mahan did not find himself in a situation where a reasonable person would have believed that he was in police custody or detention; nothing suggests that a reasonable person in his position would not have felt free to terminate the interview at any time. In this situation, it is simply of no moment that Mahan had been summoned to the interview by one of his supervisors at work, or that Agent Walsh told him that giving false information during the interview would be a serious matter. Neither fact even remotely constitutes a restraint on the freedom of movement to the degree associated with formal arrest. *See, e.g., Warner*, 971 F.2d at 1200–02 (holding that *Miranda* warnings were not required where the defendant "was not questioned in a custodial setting and was not under arrest or any restraint, even though she was a suspect"); *United States v. Toby*, 1997 WL 369457 (6th Cir.1997) (unpublished disposition) (holding that *Miranda* warnings were not required where even though the defendant was "at the accusatory stage," he was not placed under arrest, was questioned at home, retained freedom of movement during the interview, and was free to terminate the interview at any point).

**B.**

■ Mahan fares no better with his claim that Agent Walsh's actions during the course of the interview were coercive, thus rendering his statement involuntary. Mahan alleges that Agent Walsh coerced him into admitting his role in the crime by telling him that he could get into serious trouble for providing false information and that his story was unbelievable. We disagree.

■ The district court's conclusions concerning the voluntary nature of an inculpatory statement are reviewed *de novo*. *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir.1991). When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary. *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.1992). This Court has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988).

■ On appeal, Mahan asserts that, "[a]ny psychological coercion, however, slight, renders a statement involuntary." (D. Br. at 11.) This is simply incorrect. "[N]ot all psychological tactics are unconstitutional. In determining whether a confession has been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning 'whether a defendant's will was overborne in a particular case.'" *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994) (citation omitted). Relevant factors may

include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Id.* See also *United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir.1997) (stating that this Court looks to the totality of the circumstances to determine whether the defendant's will was overborne by police coercion) (citing *United States v. Brown*, 557 F.2d 541, 546 (6th Cir.1977)).

The totality of the circumstances here indicates that Mahan's statement was the product of free and rational choice rather than any police coercion. The only "coercion" Mahan alleges is Agent Walsh's statement that lying could get him in serious trouble. Notably, as set forth above, (i) Mahan was never placed under or threatened with arrest; (ii) Agent Walsh never brandished a handgun or handcuffs, or any other items associated with force or coercion; (iii) the interview took place in an unlocked room at Mahan's workplace, and Mahan was never told that he could not leave; (iv) the interview lasted only an hour and a half, including the time required to change rooms; and (v) Agent Walsh made no promises to induce Mahan's cooperation, nor did he make any threats of physical violence.

We thus conclude that the totality of the circumstances surrounding Mahan's interview fall far short of the police coercion required to render a defendant's statement involuntary. See, e.g., *United States v. Gatewood*, 184 F.3d 550 (6th Cir.1999) (rejecting the defendant's claim that his confession was involuntary where, among other things, the interrogation was "conducted during regular business hours" and lasted only 3.5 hours, despite the defendant's allegation that the officers had threatened to charge him with other crimes and keep him from his wife); *Ledbetter*, 35 F.3d at 1069–70 (holding that the petitioner's confession was voluntary where, even though officers told the peti-

tioner lies to induce his statement and the interrogation took place in the midnight hours, no physical punishments or threats were used, he had not been denied any physical necessities, and the interrogation was not unduly lengthy); *United States v. Thomas*, 1997 WL 764495 (6th Cir.1997) (unpublished disposition) (holding that confession was voluntary where uniformed and armed officers told the defendant that it would be better if he told the truth, but did not express their view of the punishment he faced, and made no promises to the defendant).

### III.

 Mahan next contends that the district court erred in sustaining the government's objection to his peremptory strike of the only African–American prospective juror upon finding that the strike was motivated by discriminatory intent. According to Mahan, his peremptory strike should have been upheld because (i) the government did not establish a systematic pattern of racial discrimination in his exercise of peremptory strikes; and (ii) he offered a race-neutral explanation for the challenged strike. The district court's ruling on the ultimate question of discriminatory intent in the exercise of peremptory challenges is a finding of fact that this Court reviews for clear error. See *United States v. Hill*, 146 F.3d 337, 341 (6th Cir. 1998) (citing *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). We find none.

### A.

After Mahan exercised one of his peremptory challenges to strike the panel's only African–American venire person, the government requested guidance as to why this juror was stricken. Mahan's counsel provided the following explanation:

> She's a clerical worker for Sears and we feel like her position is so similar to his that we don't want her confusing what she does and what he does, it may alter

the facts of this case, how these things were, we don't want her confusing what she does with what goes on with his position as a clerical worker. And she has been separated or widowed, we don't want to hold her bias against men, we're afraid she may have some bias against men being separated or divorced.

(J.A. at 202–03.) The government then objected that Mahan was actually striking the juror on account of her race, contrary to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and its progeny, which prohibit the discriminatory exercise of peremptory challenges on the basis of race or gender in violation of the Equal Protection Clause.[1] After hearing argument by counsel for both sides, the district court upheld the government's objection upon finding that the juror had been stricken on account of her race.

### B.

 In determining whether a party has committed a *Batson* violation in its exercise of a peremptory challenge, a district court must follow a three-step process. *See Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). First, the court must determine if the opponent of the peremptory challenge has made out a prima facie case of racial discrimination (step 1). Second, if a prima facie case has been made, the burden of production shifts to the proponent to come forward with a race-neutral explanation (step 2). Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful discrimination (step 3). *Id.* Notably, "the ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike." *Id. See also United States v. McFerron*, 163 F.3d 952 (6th Cir.1998) (holding that the district

court erred in imposing the burden of persuasion on a black female defendant to justify her peremptory strikes of white male prospective jurors).

 We find without merit Mahan's claim that the government failed to set forth a prima facie case of racial discrimination (step 1) because it did not demonstrate a systematic pattern of racial discrimination in the exercise of his peremptory challenges. There is simply no requirement that the government establish the existence of a pattern of discrimination. Instead, the *Batson* Court only stated:

> In deciding whether the [strike opponent] has made the requisite showing [of purposeful discrimination], the trial court should consider all relevant circumstances. *For example*, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination.

*Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712 (emphasis supplied). The Court went on to list additional circumstances that might give rise to an inference of discrimination, and expressly cautioned: "These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if [a party's] use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Id.* at 97, 106 S.Ct. 1712.

 Here, Mahan—a white man charged with a racial hate crime against an African–American family—exercised his peremptory challenge to strike the only prospective black juror. Of course, since the panel included only one African–American venire person, no "pattern" of racial discrimination could be established. Mahan's conspicuous exercise of a peremptory

---

1. In *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court extended *Batson's* holding to situations in which a criminal defendant, as opposed to the prosecution, exercises peremp-

tory challenges in a discriminatory manner so that prosecutors may challenge a criminal defendant's use of challenges in violation of equal protection.

challenge under these circumstances was more than sufficient to establish a prima facie case of intentional discrimination.

■ Once the government demonstrated a prima facie case of discrimination, the responsibility fell to Mahan to articulate a race-neutral explanation for striking the only prospective black juror (step 2). Mahan met this responsibility by claiming that the juror was stricken (i) because as a clerical worker, she might confuse her job with his; and (ii) because she had been divorced or widowed, she might have a bias against men. *See Purkett*, 514 U.S. at 768–69, 115 S.Ct. 1769 (stating that the strike proponent's race-neutral justification at step 2 need not be persuasive, or even plausible, but merely facially valid).

■ The district court then had to make the final determination of whether the government had met its burden of proving purposeful discrimination by a preponderance of the evidence (step 3). *See United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir.1996). We perceive no clear error in the district court's finding of discriminatory intent. "At this step of the analysis, the district court has the responsibility to assess the [strike proponent's] credibility under all of the pertinent circumstances, and then to weigh the asserted justification against the strength of the [strike opponent's] prima facie case under the totality of the circumstances." *Hill*, 146 F.3d at 342.

The court below considered the government's argument that Mahan's "clerical" position was entirely irrelevant, and that, under Mahan's logic, he would want to exclude anyone who has access to a workplace photocopier. The court further observed that, despite Mahan's purported fear of potential prejudice, his counsel did not ask the prospective juror about her past photocopying experience or any bias she might have against men. Accordingly, viewing the totality of the circumstances, the court found that the juror had been stricken with discriminatory intent. The court noted that Mahan was charged with "an alleged hate crime with racial overtones to it," and that the prospective juror was the only African–American on the panel. (J.A. at 208.) In addition, the court found that Mahan's proffered explanations for the strike were implausible in that they "had no relationship to any legitimate purpose in the striking in this case." (J.A. at 208–09.)

Where Mahan's purported explanations were so far-reaching and nonsensical, the district court did not commit clear error in finding that his exercise of the peremptory strike under these circumstances was motivated by racial discrimination. *Compare with Tucker*, 90 F.3d at 1142 (finding that the district court did not clearly err in upholding the prosecution's exercise of a peremptory strike where the "prosecution's explanation was inherently believable" and the defendant failed to dispute the proffered reason as mere pretext).

**IV.**

■ Finally, Mahan raises two objections to his sentence under the federal sentencing guidelines. He argues that the district court erred in: (i) denying his request for a "role in the offense" sentence level reduction pursuant to U.S.S.G. § 3B1.2; and (ii) denying his request for an "acceptance of responsibility" reduction pursuant to U.S.S.G. § 3E1.1. In considering a defendant's sentence under the guidelines, we review the district court's factual findings for clear error. *United States v. Clements*, 144 F.3d 981, 982 (6th Cir.1998) (citing *United States v. Berridge*, 74 F.3d 113, 116 (6th Cir.1996)). "When seeking a downward adjustment of a sentence otherwise required by the guidelines, a defendant has the burden of proving by a preponderance of the evidence his or her entitlement to a reduction." *United States v. Adu*, 82 F.3d 119, 123 (6th Cir.1996). We conclude that Mahan has not met this burden on either claim.

## A.

■ The district court did not commit clear error in denying Mahan's request for either a four-level "minimal participant" reduction pursuant to U.S.S.G. § 3B1.2(a), or a two-level "minor participant" reduction pursuant to § 3B1.2(b). Mahan claims that he is entitled to a "role in the offense" reduction because his participation in the crime was limited to making copies of the hate flyer that Porter and Dunn had given to him, and he had no involvement in placing the flyers on the family's lawn. We disagree.

The four-level "minimal participant" reduction "is intended ... [to] be used infrequently," in cases where, although the defendant participated in the criminal activity, he had little or no "knowledge or understanding of the scope and structure of the enterprise and the activities of [the] others." See U.S.S.G. § 3B1.2, comment. (nn. 1 & 2). This adjustment is primarily for someone who played a single, limited role in a very large organization, such as "someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment." Id., n. 2.

In this case, Mahan's role was not limited to a single act in a large conspiracy; instead, as the district court observed, the conspirators "may have had different roles, but they were all equally culpable in this matter." (J.A. at 216.) The government presented evidence (i) that Mahan knew of his co-conspirators' plans for the hate flyer before he copied it; (ii) that he had actively participated in the racial harassment by joining Dunn and Porter in yelling racial epithets outside the family's home; and (iii) that he took steps to avoid detection by the authorities (by concocting the alibi about finding the flyers on the roadside and by making sure not to leave any fingerprints). It thus appears that Mahan well understood the scope of the conspiracy to deprive the family of their right to occupy their home free from racial harassment, and actively participated in this conspiracy. See United States v. Ledezma, 26 F.3d 636, 646 (6th Cir.1994) (holding that the district court's denial of a "minimal participant" reduction was not clearly erroneous where "nothing in the record indicates that [the defendant] lacked knowledge or understanding of the enterprise").

■ These same facts render Mahan ineligible for a two-level "minor participant" reduction. This reduction applies to a defendant who is substantially less culpable than most other participants, but whose role could not be described as minimal. U.S.S.G. § 3B1.2, comment. (n. 3). Even though Mahan did not personally place the hate flyers on the family's lawn, his conduct in, among other things, copying the flyers with even general knowledge of Dunn and Porter's plans, participating in yelling racial slurs and concocting the alibi, indicates that he is not substantially less culpable than his co-conspirators. Moreover, Mahan's role in copying the flyers—so that the lawn was literally littered with hate—was essential to the overall scheme. See, e.g., United States v. Latouf, 132 F.3d 320, 332 (6th Cir.1997) (holding that even though defendant "was not a main player" in the criminal enterprise, his "import in the overall scheme" made him more than a minor participant).

## B.

■ Nor did the district court commit clear error in denying Mahan's request for an offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, despite the fact that Mahan admitted his conduct in copying the flyers. A defendant is entitled to a two-level reduction in sentence only if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1 comment. (n.5).

We believe that Mahan is not entitled to an "acceptance of responsibility" reduction where he pleaded not guilty before the district court, was found guilty only after a jury trial, and on appeal continues to downplay his participation in the conspiracy to intimidate the family into fleeing their home. "Although the guidelines permit a defendant to receive credit under § 3E1.1(a) even if he goes to trial, the reduction is 'not intended for a defendant who puts the government to its burden of proof at trial by denying the factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.'" *United States v. Hill*, 167 F.3d 1055, 1071 (6th Cir.1999) (quoting U.S.S.G. § 3E1.1 comment. (n. 2)). This commentary provides that while conviction by trial does not automatically preclude an acceptance of responsibility reduction, an adjustment in such a case is to be rare, and is conceivable primarily in a situation in which a defendant admits his factual guilt but goes to trial to test the constitutionality or applicability of the governing criminal statute. U.S.S.G. § 3E1.1, comment. (n. 2).

That is not the case here. Mahan did not go to trial simply to test the constitutionality or applicability of the civil rights laws under which he was convicted. Instead, he steadfastly contested his factual guilt, claiming that he duplicated the flyers without any specific knowledge that they would be scattered on the family's lawn and without any intent to do harm. Mahan continues to make these claims on appeal, thus denying that he possessed the requisite intent to violate the family's civil rights or that he entered any agreement to conspire to do so. Where Mahan has consistently denied essential elements of the offense and thus continues to contest his factual guilt, the district court did not commit clear error in declining to award him an offense-level reduction under § 3E1.1. *See, e.g., United States v. Lutz*, 154 F.3d 581, 589 (6th Cir.1998) (holding that the defendant was not entitled to an "acceptance of responsibility" reduction where she admitted her actions but denied any intent to engage in criminal activity); *United States v. Lynn*, 1999 WL 97244 (6th Cir.1999) (unpublished disposition) (holding that denial of § 3E1.1 reduction was not clear error where a defendant convicted of running an illegal gambling business contested his factual guilt at trial by claiming that he lacked the requisite intent because he did not know that the machines were being used for gambling).

## V.

For the reasons set forth above, we AFFIRM Mahan's conviction and sentence in all respects.