**UNITED STATES of America,**
**Plaintiff,**

v.

**Matthew STUEMKE, Defendant.**

**No. 3:05cr139.**

United States District Court,
S.D. Ohio,
Western Division.

June 26, 2006.

Matthew Stuemke, Bethune, SC, Pro se.

Robert Charles Bartlemay, U.S. Attorney's Office, Dayton, OH, for Plaintiff.

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (DOC. # 13); CONFERENCE CALL SET

RICE, District Judge.

Defendant Matthew Stuemke ("Defendant" or "Stuemke") is charged in the Indictment (Doc. # 2) with three counts of engaging in sexual acts with a minor on Wright–Patterson Air Force Base, the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 2243(a). This case is now before the Court on the Defendant's Motion to Suppress Statements (Doc. # 13). The Court conducted an oral and evidentiary hearing on February 24, 2006, and the parties have filed their post-hearing memoranda. *See* Docs. ## 25–27. The Court now rules upon that motion, beginning its analysis by setting forth its factual findings based upon the evidence introduced during the hearing.

On September 19, 2005, Special Agent Raymond Gannon ("Gannon") of the Federal Bureau of Investigation ("FBI") sent an email to Special Agent Jeffrey Roberts ("Roberts"). At the time, Gannon was assigned to the Dayton resident agency of the FBI, while Roberts worked in that agency's Columbia, South Carolina, division. Gannon informed Roberts that an individual suspected of having engaged in inappropriate sexual activity with four juvenile females was residing in Roberts' area and asked Roberts to interview the suspect, the Defendant. In a subsequent communication between the two agents, Gannon told Roberts that he had spoken with Stuemke about the allegations concerning inappropriate sexual relations be-

tween himself and four juvenile females, and that he had agreed to be interviewed.

On September 23, 2005, Roberts, accompanied by Special Agent Larry Walker ("Walker") of the Air Force Office of Special Investigation,[1] traveled to Bethune, South Carolina, where Defendant resided, in order to interview him.[2] When they arrived, the agents parked their vehicle in front Defendant's residence.[3] The Defendant walked around to the front of that residence and greeted the agents. After the three had shaken hands, Stuemke took them to the rear of the structure, where he an his wife resided, and invited them to enter his living area where they could ask their questions.

After obtaining a quick biographical sketch of the Defendant, Roberts began the interview by reminding Stuemke that he (Defendant) had spoken with Gannon and that they had come to interview him about the issues of which Gannon had spoken.[4] Roberts also indicated that they were not going to give Defendant the *Miranda* warnings and that he was free to stop the interview and ask them to leave at any time. Roberts also indicated that this was Stuemke's opportunity to answer allegations that had been made against him concerning his sexual relationships with four juvenile females, while living on

Wright–Patterson Air Force Base in Dayton. Stuemke told the agents that, after he had been released from the Parchment Detention Center, he moved to the Dayton area in May, 2004, where he initially lived with his uncle on Woodbine Avenue. Thereafter, the Defendant had been contacted by Robert Keyes, the 14–year old son of Gary Robert Keyes, a friend of Stuemke's, and the son of Master Sergeant Darlene Tryon ("Tryon"). Tryon and Gary Robert Keyes were divorced. Since Tryon was to serve temporarily out of the area, Stuemke moved into her residence to look after Robert Keyes in July, 2004.[5]

Roberts then turned the questioning to the subject of Defendant's relationships with the four young females, specifically asking the Defendant whether he had had sexual relations with each of the four juveniles. Although Stuemke conceded that he knew each of the four juvenile females,[6] he initially denied having had such relationships with any of them. When Roberts told the Defendant that each of the juveniles had told officials that they had had sexual relations with him, Stuemke continued to deny that he had engaged in such activity. Roberts cut the Defendant off, and explained to him that each of the four juvenile females had given authorities a detailed statement of what had occurred

1. Walker was stationed at Shaw Air Force Base in South Carolina.

2. Before leaving to interview Defendant, Roberts obtained legal advice to the effect that the officers would not be required to provide the *Miranda* warnings to Stuemke, if they interrogated him at his residence, after having been invited there by the Defendant himself.

3. As they were driving to Bethune, Roberts and Walker got lost on two occasions and had to call the Defendant, who gave them directions.

4. Roberts asked the vast majority of questions during the interrogation of Stuemke.

5. Stuemke's stay at the Tryon residence was extended by the fact that she subsequently contracted cancer and Robert Keyes continued to need adult supervision. Defendant left in late January, 2005, when Tryon asked him to move out.

6. Stuemke told the agents that Robert Keyes had introduced him to the four juvenile females and indicated that he (the Defendant) had dated one of them, until her father told him that he was too old to date his daughter, given that she was only 17 years of age,

between him and her. Roberts also indicated that this was his opportunity to explain what had happened and that investigators were not obligated to give him that opportunity. In addition, Roberts warned Stuemke that lying to a federal agent is a federal offense and indicated that it was possible that he and Walker would leave Stuemke's residence and obtain an arrest warrant, if they found his previous statements to be untrue. Then, Roberts once again questioned him about whether he had had sexual relationships with the four juvenile females. Stuemke conceded that he had had vaginal intercourse with at least three of the juveniles.[7] At the conclusion of the interrogation, Roberts and Walker left Stuemke's residence, without having arrested him or taken him into custody. The interview had lasted slightly more than one hour.

■ Although Roberts and Walker interrogated Stuemke without having given him the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Defendant has not argued in his post-hearing memorandum (Doc. # 25) or his motion (Doc. # 13) that his statements must be suppressed as a result of that failure. Given that the lack of such warnings was, however, mentioned throughout the evidentiary hearing and in Defendant's post-hearing submission, the Court will initially set forth its reasons for concluding that the failure to provide those warnings, in and of themselves, does not serve as the basis for suppressing Defendant's statements to Roberts and Walker.

■■ In *Miranda*, the Supreme Court announced a prophylactic rule requiring that a suspect be provided with certain warnings before being subjected to a custodial interrogation. The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. 1602. *See also, Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Herein, since it could not be questioned that Stuemke was interrogated, the questioning violated *Miranda*, if he was in custody at the time. In determining whether an individual was in custody for purposes of *Miranda* warnings, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Mathiason, supra*, 429 U.S. at 495, 97 S.Ct. 711). *See also, Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526. As the United States Supreme Court has instructed, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *Accord, United States v. Crossley*, 224 F.3d 847, 861 (6th Cir.2000); *United States v. Mahan*, 190 F.3d 416 (6th Cir.1999).

In *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied*, 523 U.S. 1122, 118 S.Ct. 1805, 140 L.Ed.2d 943 (1998), the Sixth Circuit explained:

> The Supreme Court has distinguished between "custodial interrogation" and the mere questioning of a suspect in a "coercive environment":

---

7. Stuemke was not questioned about whether he had such relations with the fourth juvenile female.

[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.

[*Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)]. *See also, United States v. Phillip*, 948 F.2d 241, 247 (6th Cir.1991), *cert. denied*, 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992) ("Coercive environments not rising to the level of formal arrest ... do not constitute custody within the meaning of *Miranda*."); *United States v. Knox*, 839 F.2d 285, 291–292 (6th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).

133 F.3d at 948. In *Salvo*, the Sixth Circuit indicated that when determining whether the defendant was in custody, the District Court may consider whether a reasonable person in the defendant's position would have believed that he was not free to go. *Id.* at 948. In *United States v. Ozuna*, 170 F.3d 654 (6th Cir.1999), the Sixth Circuit indicated that the "free to go" standard must be applied with caution, since under some circumstances an individual, such as a motorist stopped by a police officer, will not be in custody even though he is not free to leave. *Id.* at 658 n. 3. The *Ozuna* court also stressed that since an objective standard must be applied to ascertain whether a defendant was in custody, the subjective beliefs of the defendant and the interrogating officer are not dispositive. *Id.* at 658. *See also United States v. Galloway*, 316 F.3d 624 (6th Cir. 2003)

In *United States v. Lawrence*, 892 F.2d 80, 1989 WL 153161 (6th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1325, 108 L.Ed.2d 500 (1990), the Sixth Circuit held that when a defendant seeks to suppress his statements on the basis that he was not given *Miranda* warnings, he has the burden of proving by the preponderance of the evidence that he was entitled to those warnings, because he was subjected to a custodial interrogation. *Accord, United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir.), *cert. denied*, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *United States v. Swanson*, 2006 WL 335849 (S.D.Ohio 2006).

Herein, the one-hour interrogation occurred in the house in which the Defendant resided with his wife and children. The Defendant had been contacted by Gannon, before Roberts and Walker traveled to his residence in Bethune, to ask Stuemke whether he would answer questions about his alleged sexual relationships with the four juvenile females. The Defendant agreed to such questioning. While driving to Bethune, Roberts and Walker called Defendant, when they became lost, and he willingly gave them directions. When the agents arrived at his residence, Stuemke greeted them and invited them inside, in order to answer their questions. Roberts explained to Defendant that he was free to terminate the questioning at any time. Under these circumstances, the Court cannot conclude that a reasonable person in Stuemke's position would have believed that he had been formally arrested or that his freedom of movement had been restrained to the degree associated with a formal arrest.

Accordingly, the Court concludes that Defendant was not in custody when interrogated by Roberts and Walker and that, therefore, the failure to provide the *Miranda* warnings prior to that interrogation does not in and of itself require the suppression of his statements to the agents.

█ Defendant argues that this Court must suppress his statements in accordance with *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Therein, Siebert was subjected to a lengthy custodial interrogation, which was not preceded by the requisite *Miranda* warnings. After she had confessed, the officer conducting the custodial interrogation gave her the requisite warnings and resumed the interrogation, seeking to have her confirm the confession she had given to the officer before being given the warnings, and Siebert confirmed that confession. After having been charged,[8] Siebert moved to suppress the statements she had made. During the suppression hearing, the officer who had interrogated her testified that he had intentionally employed the two-step interrogation technique of getting a suspect to confess during a custodial interrogation, before providing the warnings, and then having her confirm her earlier confession after the warnings have been given. Although the trial court suppressed the statements Siebert had made prior to being given the warnings, it refused to suppress her post-warning confirmation of her earlier confession. After having been convicted, a Missouri intermediate appellate court affirmed. Upon further appeal, the Missouri Supreme Court reversed, concluding that the post-warning statements should also have been suppressed. In ruling upon Missouri's appeal from that decision, a majority of the United States Supreme Court concluded that the fruit of the two-step interrogation procedure employed therein was inadmissible. The four-Justice plurality opinion authored by Justice Souter held that *Miranda* warnings given only after successful interrogation would not effectively advise the suspect that she had a real choice about giving an admissible statement at that juncture or that she could choose to stop talking even though she had talked earlier. *Id.* at 612–13, 124 S.Ct. 2601. The fifth vote in support of the affirmance of the decision of the Missouri Supreme Court was provided by Justice Kennedy, who concluded that a two-step interrogative technique would offend *Miranda* only if it was used in a calculated manner to undermine the warnings. *Id.* at 622, 124 S.Ct. 2601.

Defendant contends that *Seibert* mandates his statements must be suppressed, because Roberts obtained legal advice to the effect that the officers would not be required to provide the *Miranda* warnings to Stuemke, if they interrogated him at his residence, after having been invited there by the Defendant himself. In effect, Stuemke is arguing that anytime the police interrogate an individual who they know is not in custody, and that, therefore, need not be provided the warnings, they must provide *Miranda* warnings. It bears emphasis that the Supreme Court held therein that the warnings must be given before subjecting a suspect to a *custodial* interrogation. Nothing in *Seibert* remotely suggests that the Supreme Court altered the *Miranda* rule to require the warnings also be given before interrogating a suspect who the officers know is not in custody. In *Seibert,* the suspect was unquestionably in custody throughout the entirety of the

---

8. Siebert was charged with the first degree murder of a mentally ill teenager who lived in her residence.

two-step interrogative process. Moreover, Roberts and Walker did not employ an interrogative technique which remotely resembles the two-step approach utilized by the interrogator in *Seibert*.

Accordingly, the Court concludes that *Seibert* does not mandate the suppression of Defendant's statements. *See also State v. Estes*, 2005 WL 2626194 (Ohio App.2005) (concluding that *Seibert* is inapplicable when the defendant has not been subjected to a custodial interrogation).

■ Alternatively, Defendant argues that the Court must suppress his statements, because they were involuntary. Not surprisingly, the Government does not agree that those statements were involuntary. As a means of analysis, this Court will initially set forth the legal standards it must apply whenever a defendant requests the suppression of his statements to officers because they were not voluntary.

■ The Supreme Court has held that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The question in each of these cases is whether a defendant's will was overborne at the time he confessed. *Reck v. Pate*, 367 U.S. 433, 440, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). "In determining whether a defendant's will was overborne, the Court looks at the totality of the circumstances surrounding the confession." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir.2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The Supreme Court has also held that "coercive police activity is a necessary predicate to finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In *United States v. Ostrander*, 411 F.3d 684 (6th Cir.), *cert. denied*, 546 U.S. 956, 126 S.Ct. 469, 163 L.Ed.2d 357 (2005), the Sixth Circuit restated the fundamental principles to be applied in determining whether a confession was voluntary:

> The government bears the burden of proving by a preponderance of the evidence that a confession was voluntary. *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.1992). To establish that a confession was involuntary, we require three elements: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir.1999) (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988)); *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir.2003). Factors relevant to determining whether defendant's will was overborne include age, education, intelligence, awareness of rights, length of questioning, and use of physical punishments. *Mahan*, 190 F.3d at 423; *see also United States v. Doe*, 226 F.3d 672, 680 (6th Cir.2000); *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997).

*Id.* at 696.

Herein, the only tactic that was arguably coercive was Roberts' statement that lying to a federal officer is an offense and that the officers could leave Defendant's residence and return with an arrest warrant, if they believed that he was lying. Assuming for present purposes that Roberts' statements were objectively coercive, this Court finds that, under the totality of the circumstances, they were not sufficient to overbear Stuemke's will.

Defendant was 31 years of age when he was interviewed by Roberts and Walker. *See* AO 257 (Doc. # 1). Rather that being a neophyte with respect to the criminal justice system, Stuemke had been previously convicted of one offense and served a term of incarceration.[9] The questioning of Stuemke occurred in his residence, into which he had invited Roberts and Walker. As is indicated above, Defendant was not in custody during the interrogation. Roberts explicitly advised the Defendant that his participation in the questioning was voluntary and that he could end it at any time. The interrogation lasted slightly more than one hour. Throughout the process, neither Roberts nor Walker used physical intimidation or punishment, nor did either give the slightest hint of the threatened use of same.

In addition, the circumstances which give rise to Defendant's claim, that his confession should be suppressed because it was involuntary, are remarkably similar to those in *Mahan, supra,* wherein the Sixth Circuit rejected the same type of claim:

> On appeal, Mahan asserts that, "[a]ny psychological coercion, however, slight, renders a statement involuntary." (D. Br. at 11.) This is simply incorrect. "[N]ot all psychological tactics are unconstitutional. In determining whether a confession has been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning 'whether a defendant's will was overborne in a particular case.'" *Ledbetter v. Edwards,* 35 F.3d 1062, 1067 (6th Cir.1994) (citation omitted). Relevant factors may include the defendant's age, education and intelligence; whether the defendant ˙has been informed of his constitutional rights; the length and extent of the questioning;

and the use of physical punishment, such as the deprivation of food or sleep. *Id. See also United States v. Murphy,* 107 F.3d 1199, 1205 (6th Cir.1997) (stating that this Court looks to the totality of the circumstances to determine whether the defendant's will was overborne by police coercion) (citing *United States v. Brown,* 557 F.2d 541, 546 (6th Cir.1977)).

The totality of the circumstances here indicates that Mahan's statement was the product of free and rational choice rather than any police coercion. The only "coercion" Mahan alleges is Agent Walsh's statement that lying could get him in serious trouble. Notably, as set forth above, (i) Mahan was never placed under or threatened with arrest; (ii) Agent Walsh never brandished a handgun or handcuffs, or any other items associated with force or coercion; (iii) the interview took place in an unlocked room at Mahan's workplace, and Mahan was never told that he could not leave; (iv) the interview lasted only an hour and a half, including the time required to change rooms; and (v) Agent Walsh made no promises to induce Mahan's cooperation, nor did he make any threats of physical violence.

We thus conclude that the totality of the circumstances surrounding Mahan's interview fall far short of the police coercion required to render a defendant's statement involuntary. *See, e.g., United States v. Gatewood,* 184 F.3d 550 (6th Cir.1999) (rejecting the defendant's claim that his confession was involuntary where, among other things, the interrogation was "conducted during regular business hours" and lasted only 3.5 hours, despite the defendant's allegation that the officers had threatened to

---

9. Indeed, he had been released from incarceration immediately before moving to the Day-

ton area in May, 2004.

charge him with other crimes and keep him from his wife); *Ledbetter,* 35 F.3d at 1069–70 (holding that the petitioner's confession was voluntary where, even though officers told the petitioner lies to induce his statement and the interrogation took place in the midnight hours, no physical punishments or threats were used, he had not been denied any physical necessities, and the interrogation was not unduly lengthy); *United States v. Thomas,* 1997 WL 764495 (6th Cir. 1997) (unpublished disposition) (holding that confession was voluntary where uniformed and armed officers told the defendant that it would be better if he told the truth, but did not express their view of the punishment he faced, and made no promises to the defendant).

190 F.3d at 422–23.

Herein, the Defendant argues that two factors render his confession involuntary, to wit: the officers' statement that it was a crime to lie to federal officers and their statement that they could leave and get a warrant to arrest him if he did lie. Since those factors are materially indistinguishable from the facts and circumstances giving rise to the claim of the defendant in *Mahan* that his confession was involuntary, this Court reaches the same conclusion herein.

Accordingly, this Court concludes that the Government has met its burden of proving by the preponderance of the evidence that Stuemke's statements to Roberts and Walker were voluntary.[10]

Based upon the foregoing, the Court overrules Defendant's Motion to Suppress Statements (Doc. # 13).

Counsel will note that the Court has scheduled a telephone conference call on Monday, July 3, 2006, at 8:30 a. m., for the purpose of selecting a new trial date for this prosecution.

---

**10.** In reaching this conclusion, the Court notes that the cases cited by Defendant do not support the premise that his confession was involuntary. For instance, in support of that premise, he has cited *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). Therein, a decision which predated *Miranda,* the Supreme Court concluded that Spano's confession was involuntary, given that the he had been subjected to an eight-hour custodial interrogation beginning at 7:00 in the evening, despite repeatedly telling his interrogators that he had been advised by counsel not to speak with them. Moreover, throughout the interrogation, which ended after 3:00 a.m., Spano was denied repeated requests to speak with his attorney. He finally succumbed to the fourth entreaty from a boyhood friend, who was a trainee with the New York Police Department and who pleaded with Spano to confess, because he (the boyhood friend) would get in trouble with the Department if he did not.