NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0196n.06

No. 23-1033

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 02, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| ROBERT HULSE, | ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: MOORE, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.

BLOOMEKATZ, Circuit Judge. A jury convicted Robert Hulse of receiving, possessing, and distributing child pornography based, in large part, on an illicit cache that investigators discovered inside his house. Hulse now argues that his convictions are tainted for two reasons. First, the district court did not suppress a recorded conversation that he had with law enforcement personnel. Second, the district court did not dismiss the case after his internet router—which he says would have aided in his defense—went missing. Yet the small portion of the recorded interview that the government used at Hulse's trial did not unlawfully incriminate him. And we will not disturb the district court's finding that the government didn't take Hulse's internet router or the court's conclusion that the router didn't have any exculpatory value given that Hulse had child pornography stored on multiple devices. We affirm.

**FACTUAL BACKGROUND**

Three times between October 2016 and January 2017, an undercover federal law enforcement agent used peer-to-peer software to download files containing child pornography from an IP address that he traced to Portage, Michigan. The resulting investigation led to the Wi-Fi network that transmitted the child pornography, and the signal was coming from Hulse's residence. Based on this information, law enforcement agents obtained a search warrant for Hulse's house and planned to execute it on June 28, 2017.

That morning, a federal agent arrived at Hulse's house shortly after 5 a.m. and followed Hulse as he drove to work. When the agent and his team returned to the house to serve the warrant, nobody answered the door. Rather than force their way into Hulse's home, two federal agents and a Portage Police Department officer went back to Hulse's workplace to ask him to open the house for them. The two federal agents went into Hulse's office in plainclothes, identified themselves as law enforcement, and privately asked Hulse if he would open his house after producing a copy of the search warrant. Hulse asked the agents if he had to open the house for them, and they responded that he did not have to, but they would force entry if he declined. The agents also informed Hulse they wanted to speak with him about their investigation. Hulse agreed to go back to his house with the two federal agents.

One of the agents asked Hulse if he could ride back to the house in Hulse's car. The agent wanted to search Hulse's car before he got in as a safety precaution, knowing that Hulse had a handgun registered to him. But Hulse refused to allow a warrantless search of his vehicle because he didn't want his colleagues to see that happening in the parking lot. Hulse did, however, allow the agent to hold onto his work and personal cell phones and later consented to a search of the

devices. The agent then rode back to Hulse's house with him; the two made small talk along the way.

Upon arriving at the residence, federal agents and Portage police officers entered the house using the garage door opener and security code Hulse gave them. Hulse went inside with the agent who rode with him. Hulse, the agent, and a Portage police detective sat down at his kitchen table while seven more law enforcement personnel searched the house. The agent told Hulse that he was not under arrest and free to leave, but he could not come back into the house until the search concluded if he chose to depart. Hulse remained at the kitchen table and spoke to the agent and the detective in a "conversational" tone. Suppression Hr'g Tr., R. 63, PageID 508. The Portage detective recorded the ensuing conversation, which lasted 95 minutes.

The first few minutes of the recorded conversation were unremarkable, covering topics such as his residential history and internet service provider. Then, the agent and the detective questioned Hulse about his involvement with child pornography for about an hour and a half. During that time, Hulse consistently denied any wrongdoing, even as the detective detailed potentially embarrassing next steps in their investigation that Hulse might avoid with a confession. Hulse also said that he "need[ed] the advice of an attorney" twice. Appellant's Br. at 15–16 (reciting excerpt ending at 54:18); *id.* at 17–18 (reciting excerpt ending at 1:20:11). The conversation ended shortly after Hulse said "I definitely need to be represented by an attorney" and went to his back patio. *Id.* at 19 (reciting excerpt ending at 1:31:21); Suppression Hr'g Tr., R. 63, PageID 555–57.

Agents found child pornography on a thumb drive in Hulse's computer room and on hard drives in his garage. In total, investigators recovered at least 1,000 images and 100 videos containing child pornography from the devices in Hulse's house.

## PROCEDURAL HISTORY

The controlling indictment advanced a total of five counts against Hulse for his receipt, attempted receipt, possession, and distribution of child pornography between August 16, 2010 and June 28, 2017. In the leadup to trial, Hulse moved to suppress the 95-minute recording that the Portage detective made during the execution of the search warrant. He also moved to dismiss the indictment on the grounds that the government failed to preserve potentially exculpatory evidence—his internet router—that was subject to the search warrant. The district court held a hearing and issued a written order explaining its decision to deny both of Hulse's motions.

Though the government had the district court's permission to use the entire 95-minute recording, it played only the first three and a half minutes at Hulse's trial. The admitted excerpt revealed that Hulse had lived by himself since he bought the house in 2009 and had always maintained the same internet service there. He also told the agent and the detective the name of his wireless network and said it was password protected. The admitted excerpt lacked any mention of child pornography or other illegal activity.

The jury convicted Hulse on all five charged counts. The district court sentenced Hulse to 180 months in prison for each count, to be served concurrently with each other. Hulse timely appealed.

## ANALYSIS

### I.      Hulse's Suppression Motion

In examining the district court's decision on Hulse's motion to suppress, we review findings of fact for clear error and conclusions of law de novo. *United States v. Henry*, 429 F.3d 603, 607–08 (6th Cir. 2005).

## A.      The Due Process Claim

Hulse argues that his statements in the recorded conversation should have been suppressed under the Fourteenth Amendment's Due Process Clause because they were the result of police coercion.  Under our precedent, "a confession [is] involuntary due to police coercion where": (1) "the police activity was objectively coercive"; (2) "the coercion in question was sufficient to overbear [Hulse's] will"; and (3) "the alleged police misconduct was the crucial motivating factor in [Hulse's] decision to offer the statements." *See United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).  But, if the government shows by the preponderance of the evidence that Hulse's statements were not coerced, we deem the statements "voluntary," and their inclusion at trial would not offend his due process rights. *See id.* at 422–23.

We need analyze only whether Hulse's statements in the first three and a half minutes of the recorded interaction—the only excerpt admitted at trial—were coerced. *See United States v. Charles*, 138 F.3d 257, 264–65 (6th Cir. 1998).  Yet Hulse does not contend that anything he said in those first few minutes was involuntary.  Indeed, he doesn't say anything specific about the three-and-a-half-minute admitted excerpt.  Instead, his argument rests on police threats to tell his neighbors, employer, and family that he's under investigation for child pornography.  Those threats and any subsequent statements are in later portions of the 95-minute recorded conversation.  Even if such threats could amount to coercion, they are unconnected to the basic background information he told the government at the outset of the interview, which was the only part played for the jury. Because Hulse does not connect the admitted excerpt to any coercive activity, his Fourteenth Amendment claim fails. *Cf. id.* ("Because the government never introduced the [challenged evidence] during trial . . . . the failure to suppress the [challenged evidence] did not harm [the defendant].").

5

**B.** **The *Miranda* Issue**

Hulse further contends that he was in custody and therefore should have received a *Miranda* warning before the recorded conversation with the investigating agent and detective ever began. *See Miranda v. Arizona*, 384 U.S. 436 (1966). We need not decide whether a *Miranda* violation occurred because Hulse's statements in the admitted excerpt were voluntary and because they had an inconsequential effect on the verdict, considering the benign content of the excerpt and the overwhelming incriminating evidence against him.

Harmless-error review applies to a *Miranda* challenge, so long as the statements in question were otherwise voluntary. *United States v. Wolf*, 879 F.2d 1320, 1324 (6th Cir. 1989). As discussed above, Hulse's statements in the admitted excerpt were voluntary. Accordingly, Hulse's conviction stands if it remains clear beyond a reasonable doubt that that the jury would have returned a guilty verdict even without the statements subject to his *Miranda* challenge. *See United States v. Throneburg*, 921 F.2d 654, 658 (6th Cir. 1990) (citing *Wolf*, 879 F.2d at 1324).

We conclude that the admitted statements were harmless beyond a reasonable doubt. The three-and-a-half-minute excerpt that the government played for the jury did not mention Hulse's involvement in pornography offenses, so Hulse "was not convicted for any act admitted in the statement." *Id.* And the trial contained a critical mass of other incriminating evidence, most notably child pornography on multiple hard drives and a thumb drive discovered in Hulse's house. Therefore, admitting the recorded excerpt despite the purported *Miranda* violation was, at most, harmless error.

## II.    Hulse's Router

According to Hulse, the government lost or destroyed his internet router that was listed in the search warrant for his house. Hulse argued to the district court that the internet router would

show that someone else committed the child pornography offenses. In his view, the district court should have dismissed the case against him or, in the alternative, instructed the jury that the government mishandled exculpatory evidence.

As to Hulse's spoliation allegations, we review the district court's factual determinations for clear error and its legal conclusions de novo. *United States v. Hofsetter*, 31 F.4th 396, 429 (6th Cir. 2022), *vacated on other grounds*, 143 S.Ct. 351 (2022) (mem.). We review Hulse's challenge to the lack of a spoliation instruction for abuse of discretion. *United States v. Emmons*, 8 F.4th 454, 470 (6th Cir. 2021).

The government says that it never took the router from Hulse's house. The district court agreed, finding "the Government did not seize or review the router following the execution of the search warrant." Suppression Op., R. 51, PageID 464–65. The court relied on testimony from the case agent, who said that he decided against seizing the router because he "[d]idn't think it was necessary" after finding "child pornography . . . on multiple devices in his house." Suppression Hr'g Tr., R. 63, PageID 517–18. The court also credited the agent's testimony that the router likely had limited memory capacity, and therefore had little potential evidentiary value. Hulse points out that the router was listed in the search warrant and the government took a picture of it and documented its location. But that's not enough to leave us with a "definite and firm conviction" that the government seized the router even after discovering better evidence of Hulse's illegal activities. *See United States v. Loines*, 56 F.4th 1099, 1105 (6th Cir. 2023) (quotation omitted). Accordingly, the district court's factual finding was "plausible in light of the record viewed in its entirety." *See United States v. Caston*, 851 F. App'x 557, 560 (6th Cir. 2021) (quotation omitted).

Even if we were to conclude that the government seized Hulse's router, we agree with the district court that the router could not have proven that someone else was downloading the illicit material. Crediting Hulse's arguments would require us to believe that another person accessed his password-protected Wi-Fi network *and* multiple different hard drives within his house over the course of nearly seven years. That scenario becomes even more implausible after considering that the government's forensic investigation showed that Hulse would check on his investment account, employee account, and Facebook page in close temporal proximity with his incriminating activity. During the search of Hulse's house, agents also discovered a thumb drive containing child pornography that was conspicuously named "ROBS MOVIES." Presentence Report, R. 91, PageID 952. With these facts in mind, we cannot find reversible fault with the district court's conclusion that the router had "no apparent exculpatory value" that would have required dismissal of the charges or a special jury instruction. Suppression Op., R. 51, PageID 466 (quoting *United States v. Collins*, 799 F.3d 554, 570 (6th Cir. 2015)).

## CONCLUSION

We affirm Hulse's conviction.