**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0320n.06

**No. 14-5392**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>May 01, 2015<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | TENNESSEE |
| | ) | |
| ANGEL HERNANDEZ, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: MERRITT and WHITE, Circuit Judges; HOOD, District Judge.[*]

**HOOD**, District Judge.   Defendant-Appellant Angel Hernandez ("Hernandez" or "Defendant") was convicted by a jury of possession with intent to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a).   Prior to the trial, the district court denied Hernandez's motion in limine in which he sought to exclude statements that he made during an interview with law enforcement on March 13, 2013, finding that his waiver of his right to remain silent was knowing, intelligent, and voluntary.   The district court sentenced him to 188 months' imprisonment, over his objection, premised on a United States Sentencing Commission Guidelines (Sentencing Guidelines) base offense level of 36, which attributed to him a quantity

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

of methamphetamine found in the possession of a co-defendant for which Hernandez was uncharged. Defendant appeals both decisions. For the reasons stated below, we **AFFIRM**.

## I.

A federal grand jury charged Defendant Angel Hernandez and his co-defendant, Thomas Dobbins, with possession with intent to distribute more than fifty grams of actual methamphetamine, by reason of aiding and abetting, in Count 1 of a superseding indictment on March 18, 2013. Dobbins was also charged with being a convicted felon in possession of a firearm in Counts 2 through 6 and a convicted felon in possession of ammunition in Counts 7 through 12. The grand jury charged Hernandez with possession with intent to distribute more than fifty grams of a mixture and substance containing methamphetamine in Count 13 of the superseding indictment. The government moved to dismiss Count 1 of the superseding indictment as to Hernandez, and the court granted its motion.

Prior to trial, Defendant filed a motion in limine seeking a ruling on "the voluntariness of any alleged confession or statements of the Defendant." [DE 87, Motion in Limine, PageID# 173–74]. The district court considered Hernandez's motion in limine just prior to the jury trial as to Count 13, on December 2, 2013. After hearing testimony and argument, the court concluded that Hernandez's statements to law enforcement were given voluntarily and should not be excluded at trial.

At the hearing, Special Agent Paul Thomas ("Agent Thomas"), the primary investigator on the case involving Hernandez, testified about the March 12, 2013 execution of the search

warrant and arrest of Defendant in a room at the Deerfield Inn in Humboldt, Tennessee. Thomas explained that, although he found evidence of drug use in that motel room, Hernandez did not appear to be under the influence of drugs and was aware of the happenings around him when he was arrested. Thomas observed that Hernandez was ". . . coherent enough to know when we were coming in. He just laid down in the floor. I didn't have to tell him to get in the floor. When I come [*sic*] in the room he was already laying in the floor in the prone position." [DE 127, Transcript of Motion in Limine, Jury Trial, PageID# 325]. Hernandez was then advised of his *Miranda* rights. Before Thomas and Special Agent Danny Lewis interviewed Hernandez the next morning, on March 13, 2013, Thomas again read Hernandez his *Miranda* rights from a form, which included a space to sign if Hernandez elected to waive those rights. Thomas provided the form to Hernandez, who took a pen and signed the form. Approximately eleven hours had passed from the time that law enforcement arrested Defendant to the time that Thomas and Lewis sought to interview him. Agent Thomas observed that the defendant appeared able to tell what was going on and spoke clearly during the interview. He found Hernandez "fairly cooperative to [*sic*] the most part. But he was calm, collective [*sic*], sitting in a chair in the interview room with us." [*Id*. at 316]. Among other things,

> [d]uring the interview, Hernandez admitted to possessing the methamphetamine that investigators found in his hotel room. Hernandez advised that the methamphetamine had been brought to him from Texas for purposes of resale. Hernandez further stated that he was the leader of the Surenos 13 gang out of Nashville, Jackson, and Memphis. Hernandez indicated that he had approximately 3,000 members under him. Hernandez also stated that the money he earned from selling methamphetamine was going back to Texas and Mexico to fund his gang's endeavors.

[PSR, ¶25].

At one point during the interview, Thomas and Lewis asked Hernandez for the passcode to his telephone, and he had the wherewithal to refuse to provide it to them, although he later changed his mind and gave it to them. Thomas did not ask Defendant if he was under the influence and could not recall during the hearing whether Defendant told him that he was still high from the night before or whether Defendant had said he was not clear headed during the interview. Thomas also testified that, in his experience, it can be hard to tell how long it will take a person to become clear-headed or to no longer be under the influence of methamphetamine after using the drug, ranging from no time at all to as much as twelve hours. Agent Thomas testified that, had he suspected that Hernandez was under the influence of drugs or alcohol, he would not have conducted the interview.

Hernandez testified that, prior to Agent Thomas's arrival in the hotel room, he had smoked methamphetamine ice, snorted cocaine, and consumed a 24-pack of beer. He had been using these drugs for the 30 day period before the day the search was conducted and had not slept as a result. Despite his claimed intoxicated condition, Hernandez was able to purchase the beer, rent the room at the Deerfield Inn, and even move his belongings from one room to another when the motel staff changed his room. Five minutes before he heard the police say, "search warrant, police," he had used the slider found in the room to smoke methamphetamine ice and "did a couple of lines up [his] nose of cocaine." [DE 127 at PageID# 347–49]. Although he recalled the police beating on his door and some parts of what happened after agents entered his room, he testified that he did not recall the agents advising him of his *Miranda* rights on the night of his arrest nor did he recall the interview on March 13, 2013, except that agents brought him in and started asking him questions. He believed that he was high and under the influence at

the time he was interviewed. Hernandez testified that he did not understand what agents were asking him when they advised him of his *Miranda* rights because "[he] wasn't really all there." [*Id*. at 338]. During the interview, he told Agent Thomas that he had been doing ice, cocaine, and drinking, but he did not tell Thomas that he did not want to be interviewed because he was high or under the influence. After his arrest and the interview, Hernandez claimed that it took a while for his memory to return.

The March 13, 2013, interview was video recorded, and the recording of Hernandez's interview was played for the district court. [*Id*. at 317].

The district court announced its decision in open court, stating,

> The 13th, according to Mr. Thomas, and according to the recording here, the videotape, that Mr. Hernandez was advised of his Miranda warnings. That he did, in fact, sign and acknowledge a waiver of his rights.
>
> It's interesting also that in terms of -- just looking at the Miranda warning rights, his signature, which obviously he was somewhat under the influence, might have some bearing on the signature. But the court has received several matters that Mr. Hernandez has submitted to me pro se. And I was just comparing the signatures that he sent on that, which I assumed he would have been in a fairly lucid position, comparing that to the signature he submitted on that Miranda warning, they appear to be absolutely the same.
>
> There is no indication of a unable to sign or unable to give his signature on that occasion, which certainly has some bearing. I'm not saying it's the ultimate fact, but certainly has some bearing on whether he was lucid or was able to sign his name in a manner that was consistent with his signature on those dates, where apparently he was in jail and incarcerated when he would not be—when he would have been lucid and not under the influence.
>
> Mr. Thomas further stated that Mr. Hernandez appeared to be able to know what was going on. He was calm and collected, able to

respond. In my opinion, based upon my review of the tape, it did not appear that Mr. Hernandez was fidgety or in any way unable to answer the questions or understand the questions. He never said, huh or what, or I don't understand, or let me stop. He answered the questions about his telephone. In fact, he refused to give the officer the code to his telephone. I think he mentioned it later. The questions that were asked of him about his bringing the drugs or having drugs didn't appear to be at any time to be uncertain or unable to answer the questions.

Mr. Hernandez does state that he had taken both ice and cocaine and alcohol all on that evening before they came, before the officers came into the room. In fact, according to his testimony, he had been on it for about 30 days. Which in that time period you would have imagined that Mr. Hernandez could not have even been able to do anything if he would have been in that shape. However, he was able to obtain a room. He moved his belongings from one room to the other, or somebody did. He came into the room and apparently was quite lucid about what he recalled from the evening before.

So as Mr. Thomas indicated, a lot of what his impact upon somebody's ability to function, even under the influence, is how long they've been doing it, the strength, things of that nature. And obviously, Mr. Hernandez apparently was someone who was a frequent drug user, very frequent drug user, and could—obviously, was able to conduct his affairs and his business during that period of time even when he was under the influence.

So based upon what I've seen both in the statements—excuse me, in the video tape, the communication between Mr. Thomas and Mr. Hernandez, the court finds that Mr. Thomas—I mean, Mr. Hernandez was lucid, was able to communicate, and that his statements given to Mr. Thomas on that evening were voluntarily given following his signature on the Miranda warning rights waiver, and I find that they were voluntary, and his consent was voluntary as well.

[*Id.* at 358–61].

Trial commenced, and the jury ultimately returned a verdict of guilty as to Count 13, the sole count before it for consideration. A Presentence Report ("PSR") was prepared by the

United States Probation Office. At the sentencing hearing, the Court considered the PSR, which set forth the facts concerning Defendant's arrest in March 2013 and related that the substances seized from Hernandez's hotel room on March 12, 2013, contained a total of 216.81 grams of methamphetamine hydrochloride.

The PSR also outlined drug activity involving both Hernandez and his co-defendant, Thomas Dobbins. In September 2012, Dobbins identified Hernandez as his source of methamphetamine. Based on the total drug activity, the probation officer calculated the relevant conduct to be 619.36 grams of methamphetamine hydrochloride and 27.59 grams of methamphetamine. This included approximately 400 grams of methamphetamine hydrochloride recovered during the execution of a search warrant at Dobbins' residence on August 31, 2012, which had been the subject of Count 1 of the Superseding Indictment, and the remainder was found during the search of the hotel room where Defendant was arrested. Although Defendant did not object to most of the facts in the PSR at sentencing, he did object to inclusion of any drug amounts outside of those found during the execution of the search warrant in March 2013, including the drugs recovered during the August 2012 search of Dobbins' residence.

In light of those objections, Agent Thomas testified at the sentencing hearing regarding the drug activity outlined in the PSR. He explained how he identified Hernandez as Dobbins' supplier of methamphetamine:

> Mr. Dobbins told us in the initial interview that he was purchasing his methamphetamine ice from a Mexican male in the Crockett County area, that he only knew, what he told us, is the name of Angel. I did some checking and determined I believed it was Angel Hernandez, Jr.

> So in the initial interview with Mr. Dobbins we presented him a photo and asked him if he recognized him. He said, that's Angel, that's the guy I've been talking to.

[DE 129, Transcript of Sentencing Hearing, PageID# 507–08].

In addition, the Government introduced a compact disc containing recordings of telephone calls monitored by law enforcement and made between Dobbins and Hernandez in early September 2012, about a week after Dobbins was arrested and decided to cooperate with law enforcement. Counsel for the Government questioned Agent Thomas about the telephone calls.

> Q: Agent Thomas, there was [*sic*] a number of references in the phone call. But what would you categorize the general nature of that conversation based on your training and experience as a drug agent?
>
> A. Well, based on my training, and also based on the conversation I had with Mr. Dobbins after that call was made, he explained the conversation that they would have. When—he said when Mr. Hernandez was referring to cans of green paint, he would be talking about pounds of marijuana. And when he said they would be 750, he was saying $750 a pound.
>
> And when Mr. Dobbins would refer to the 'other,' he said he was referring to the methamphetamine ice. And Mr. Hernandez, when he was asking what the price was going to be on that, he was saying 12 or 13. And that would be 12 to $1,300 per ounce.
>
> And then Mr. Hernandez said they were trying to make a deal where if he get rid of 16, it's 11 or 12. That is 16 ounces of ice, or a pound, for 11 or $1,200. So basically you get a break on it if you buy it by the pound.

[*Id*. at 512–13].

After hearing testimony and argument, the district court issued its ruling regarding relevant conduct:

> Based again upon the evidence the court has heard, I'm going to find that the amount of methamphetamine found in Mr. Dobbins' house, and based on his testimony, or statements, rather, through the agent, and the—based upon the recorded telephone conversation the court has heard, I'm going to find that the 400 grams of methamphetamine was, in fact, relevant conduct, and should be considered in terms of the assessment of the guideline range under Paragraph 32 of the presentence report.

[*Id.* at 533–34].

The district court concluded that the United States had demonstrated by a preponderance of the evidence that 619.36 grams of methamphetamine hydrochloride and 27.59 grams of methamphetamine were attributable to Hernandez and adopted the PSR's recommended advisory guideline range of 188 to 235 months. Hernandez was sentenced to 188 months' imprisonment. Judgment was entered on March 26, 2014, and an amended judgment correcting the criminal case number was filed on April 1, 2014. Hernandez timely appealed the court's decisions on the issues addressed above.

## II.

Hernandez argues that the district court erred when it permitted the use at trial of statements that he made during his interview with law enforcement agents after he had been advised of his *Miranda* rights and signed a waiver of those rights on the morning of March 13, 2013. He maintains that his waiver and his statements could not have been made knowingly, intelligently, and voluntarily because he was so heavily intoxicated as the result of heavy drug and alcohol consumption on the evening of his arrest, more than twelve hours before the interviews were made. He intimates that Agent Thomas coerced him, taking advantage of his

intoxicated state. We conclude that the district court did not err when it denied Hernandez's motion in limine and permitted the statements to be used at trial.

When reviewing a district court's decision on a motion to suppress evidence, this Court reviews findings of fact for clear error and conclusions of law de novo. *United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008) (citing *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006)). When determining whether a waiver of rights was made knowingly, intelligently, and voluntarily, the trial court's underlying factual findings are reviewed for clear error while the legal conclusion is reviewed de novo. *United States v. Wrice*, 954 F.2d 406, 410–11 (6th Cir. 1992) (citing *United States v. Murphy*, 763 F.2d 202, 206 (6th Cir. 1985)). In this instance, the evidence is reviewed in a light most favorable to the Government because the district court denied Hernandez's motion. *Torres-Ramos*, 536 F.3d at 542 (citing *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006)).

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *See Colorado v. Connelly*, 479 U.S. 157, 163–64 (1986). "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that the has a right to the presence of an attorney, either retained or appointed." *Id*. A defendant's waiver of his *Miranda* rights is considered valid if it is voluntary, knowing, and intelligent. *Id*. A confession is involuntary if, in light of the totality of the circumstances, "the will of the accused

has been overwhelmed by official pressure." *Wrice*, 954 F.2d at 411 (citing *Murphy*, 763 F.2d at 205). "'When a defendant claims that a confession was coerced, the [G]overnment bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary.'" *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

A confession is involuntary due to police coercion if (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *Mahan*, 190 F.3d at 422 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)). In assessing whether the alleged coercion was sufficient to overcome the defendant's will, "[r]elevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Mahan*, 190 F.3d at 422-23 (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). Intoxication is another factor for the court to consider. Like other circuits, this court considers the impact of drugs and alcohol on the voluntariness of a confession on a "case-by-case basis and in view of other circumstances at play." *United States v. Montgomery*, 721 F.3d 568, 572 (6th Cir. 2010) (collecting cases); *see, e.g.*, *United States v. Fletcher*, 295 F. App'x 749, 757 (6th Cir. 2008) (upholding confession as voluntary based on officers' testimony that Appellant "did not seem impaired, was not swaying or unsteady, had no trouble signing the consent form, and appeared to be coherent."); *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004) (holding that a defendant cannot show that his confession should have been suppressed merely because he

claimed that he drank alcohol the night before his arrest), *abrogated on other grounds by Guilmette v. Howes*, 624 F.3d 286 (2010); *Garcia-Donantes v. Warren*, 769 F. Supp. 2d 1092, 1110 (E.D. Mich. 2011) (holding that, because there was no evidence that petitioner was still intoxicated at the time he spoke with police or any further evidence of coercion, petitioner was not entitled to writ of habeas corpus because he had not established his conviction was obtained with statements that were involuntary).

On the evidence before the district court, we cannot conclude that law enforcement's activity in obtaining the waiver or conducting the interview was objectively coercive. First, we conclude that the district court's factual findings were not clearly erroneous. Looking at the evidence in the light most favorable to the Government, there is sufficient evidence from which the district court could conclude that Hernandez was lucid and able to communicate and not so obviously intoxicated as to render him more susceptible to official pressure than a person who was not intoxicated, at least from the perspective of the law enforcement agent who was making the decision about whether to proceed with the interview.

Agent Thomas recalled that Hernandez was calm and collected during the interview and felt that Hernandez was able to respond to questions in a manner which did not suggest to him that Hernandez was intoxicated. The district court viewed the video recording of the interview and observed that Hernandez was neither "fidgety" nor unable to understand or answer questions posed to him by law enforcement agents and that he did not appear uncertain during the course of the interview. Having observed Hernandez's testimony and having heard all of the evidence, the district court's conclusion that Hernandez's function was not as impacted by his use of drugs and alcohol as he claimed was properly supported by the evidence available. The district court's

decision was supported by Hernandez's recollection of the evening of his arrest, his ability to communicate during the interview, and his ability to conduct his affairs and his business in that period of time even if he was under the influence. The district court's factual conclusion was further supported, however slightly, by its observation about the similarities between Hernandez's signature on the waiver form at the time of the interview when he claimed to be intoxicated and on pro se materials presented to the court at times when, presumably, Hernandez was not intoxicated. Ultimately, we are not firmly persuaded that a mistake was committed and conclude that the district court's factual findings were not clearly erroneous.

It follows, considering the matter *de novo*, that the district court did not err when it concluded that Defendant's confession was voluntary as a matter of law. There is no evidence of objectively coercive activity on the part of law enforcement and, thus, we conclude that the United States bore its burden of demonstrating by a preponderance of the evidence that Defendant's waiver of rights and his responses to law enforcement questions were made knowingly, intelligently, and voluntarily and that the statements made during the interview were voluntary. *See Johnson*, 351 F.3d at 260.

**III.**

Defendant also challenges the district court's application of the Sentencing Guidelines on the grounds that there was not sufficient evidence to find that he was responsible for the 400 grams of methamphetamine found in co-defendant Dobbins' home and, thus, susceptible to sentencing using a base offense level of 36 under U.S.S.G. §2D1.1(a)(5) and (c)(2). Specifically, he argues that the district court's conclusion that the 400 grams of methamphetamine seized from

Dobbins' home was attributable to him for the purposes of calculating his guidelines range is not supported by a preponderance of the evidence because there was no reference to prior transactions between Defendant and Dobbins during the five controlled phone calls between them nor was the quantity of methamphetamine found at and seized from Dobbins home mentioned during the calls. He also argues that Agent Thomas's testimony that the word "other" was a reference to methamphetamine was inadequate to support the conclusion that Defendant had methamphetamine to sell at any time because the word itself was not specific enough to identify the substance discussed as methamphetamine and could have had any number of meanings. The United States argues that the evidence obtained during the controlled calls, when coupled with Dobbins' statement to law enforcement that Defendant was his source for the methamphetamine, established by a preponderance of the evidence that Hernandez was accountable for the amount of methamphetamine recovered from Dobbins' residence as well as that recovered from Hernandez's motel room and, thus, the district court did not err. For the reasons which follow, we agree.

We review a district court's calculation of an advisory sentencing guidelines range as part of its "obligation to determine whether the district court imposed a sentence that is procedurally unreasonable." *See United States v. Bullock*, 526 F.3d 312, 315 (6th Cir. 2008).

> In reviewing a district court's application of the Sentencing Guidelines, this Court will "accept the findings of fact of the district court unless they are clearly erroneous and [will] give due deference to the district court's application of the Guidelines to the facts." *United States v. Williams*, 355 F.3d 893, 897–98 (6th Cir. 2003); 18 U.S.C. § 3742(e). A factual finding is clearly erroneous "when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006). We review a

> district court's legal conclusions regarding the Sentencing Guidelines de novo. *United States v. Latouf*, 132 F.3d 320, 331 (6th Cir. 1997).

*United States v. Moon*, 513 F.3d 527, 539–40 (6th Cir. 2008). The calculation of the proper drug amount attributable to Hernandez is a factual finding reviewed for clear error. *See United States v. Walton*, 908 F.2d 1289, 1300–01 (6th Cir. 1990) (citing *United States v. Barrett*, 890 F.2d 855, 867 (6th Cir. 1989)). "The district court may rely on any competent evidence in the record; however, the district court's findings must have 'some minimum indicium of reliability beyond mere allegation.'" *United States v. Hough*, 276 F.3d 884, 891 (6th Cir. 2002) (quoting *United States v. Ward*, 68 F.3d 146, 149 (6th Cir.1995)). With regard to the drug amount attributable to Hernandez at sentencing, as long as "the district court interprets the evidence in a manner consistent with the record," we will uphold the decision "even if we would have reached the opposite conclusion." *See United States v. Darwich*, 337 F.3d 645, 663 (6th Cir. 2003) (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74 (1985)); *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (stating that "'[w]here there are two permissible views of the evidence' the district court's conclusions 'cannot be clearly erroneous.'") (quoting *Anderson*, 470 U.S. at 574).

In calculating the appropriate base offense level, the sentencing court must consider quantities of drugs not specified in the counts of conviction that were part of the same conduct or common plan or scheme. *United States v. Smith*, 245 F.3d 538, 544 (6th Cir. 2001); U.S.S.G. §1B1.3(a)(1)(A). This "[r]elevant conduct need not be charged, nor must it otherwise even be within the jurisdiction of the sentencing court." *United States v. Gill*, 348 F.3d 146, 151 (6th Cir. 2003). The government has the burden of proving that a defendant is accountable for specific

conduct by a preponderance of the evidence. *United States v. Orlando*, 281 F.3d 586, 600 (6th Cir. 2002) (citing *United States v. Bahhur*, 200 F.3d 916, 924 (6th Cir. 2000)).

On the facts before us, the district court's opinion is consistent with the evidence of record as a whole. Although Dobbins was the only person arrested on August 30, 2012, at the time the methamphetamine was found in his home, he told investigators that his source for methamphetamine was a person named "Angel." His statement prompted Agent Thomas to show him a photograph of Hernandez, who Dobbins then identified as the person he knew as "Angel." Dobbins then made a series of controlled phone calls to "Angel," whose voice Agent Thomas would testify was that of Hernandez, in September 2012. Even though, as Defendant points out, Dobbins and Hernandez did not discuss the drugs found in Dobbins' house on August 30, 2012, during the controlled phone calls and the fact that they were familiar with one another does not—alone—mean that Hernandez had any involvement with the methamphetamine seized from Dobbins' residence, there is other evidence from which the district court could conclude that the 400 grams of methamphetamine was provided to Dobbins by Hernandez: Dobbins' statement to Agent Thomas.

On the evidence before the district court, specifically the testimony of Agent Thomas concerning information gained through Dobbins' cooperation and Agent Thomas' corroboration of some aspects of that information, we conclude that the court's findings below were supported by "competent evidence in the record," and had much more than a "minimum indicium of reliability." *See Hough*, 276 F.3d at 891. Although Hernandez argues that the controlled phone calls between himself and Dobbins could have "various interpretations" and the word "other…could involve any number of meanings," [Brief of Hernandez at 33], he makes no effort

to explain why the trial court's conclusion is clearly erroneous. *United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990) ("An effort must be made to demonstrate why the trial court's conclusion is clearly erroneous. On appeal all we have is the cold record, and we accord considerable deference to the credibility findings of the trial court."). Reviewing the evidence in the light most likely to support the district court's decision, we conclude that the district court's finding concerning the amount of methamphetamine attributable to Hernandez for the purposes of sentencing was not clearly erroneous. *See Moon*, 513 F.3d at 539–40; *Worley*, 193 F.3d at 384. We are not left with a definite and firm conviction that a mistake has been committed. *Moon*, 513 F.3d at 539-40. Further, giving due deference to the district court's application of the Guidelines to the facts, we conclude that the district court properly included the 400 grams of methamphetamine found in Dobbins' home when establishing the applicable offense level for Hernandez and, thus, and imposed a sentence that is procedurally reasonable. *See Bullock*, 526 F.3d at 315; *Williams*, 355 F.3d at 897-98; 18 U.S.C. § 3742(e).

## IV.

For all of the reasons stated above, we **AFFIRM** the judgment of the district court.