RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0017p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CHARLES FRANKLIN MICHAEL,

        *Petitioner-Appellant,*

    *v.*

BOBBI JO BUTTS, Warden,

        *Respondent-Appellee.*

> No. 21-5862

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:15-cv-00071—Rebecca Grady Jennings, District Judge.

Argued: December 14, 2022

Decided and Filed: February 1, 2023

Before: SUTTON, Chief Judge, GRIFFIN and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Matthew J. Higgins, HOGAN LOVELLS US LLP, Washington, D.C., for Appellant. Harrison Gray Kilgore, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Matthew J. Higgins, HOGAN LOVELLS US LLP, Washington, D.C., for Appellant. Harrison Gray Kilgore, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

NALBANDIAN, Circuit Judge. Charles Michael pleaded guilty to first-degree sodomy and first-degree sex abuse in Kentucky state court. Now, he seeks collateral review of his

conviction based on an alleged involuntary confession.  The district court rejected his claim. Because the Kentucky Supreme Court's decision did not involve an unreasonable determination of the facts or an unreasonable application of clearly established federal law, we affirm.

**I.**

In 2009, Michael, his wife Joy, his two biological daughters, Francis and Brittany, and his stepdaughter, Dorothy, lived in North Carolina.[1]  The local social services department (the "department") in North Carolina received a tip that Michael had engaged in inappropriate sexual contact with his four-year-old stepdaughter Dorothy.  On that basis, the department investigated the case.

During the investigation, Michael agreed that he would not see Dorothy or his two biological children, Francis and Brittany, until the department gave him the go-ahead.  The department closed the case because Joy and the children moved to Alabama to live with Michael's parents.  Even though the case was closed, the department recommended that Michael not have contact with the children until he completed a sex-offender evaluation.

But later that year, Joy and Michael moved to Bardstown, Kentucky.  Michael lived in a separate home from the rest of the family.  But he visited weekly.  In October 2010, the Cabinet for Health and Family Services in Kentucky told Detective Barbara Roby that Michael was possibly sexually abusing Dorothy and Francis.  To that end, Detective Roby and Social Worker Casey Newton removed all three children from the home and placed them into foster care.

After the children had been in foster care for about a week, Detective Roby contacted Joy to request an interview with Michael.  He complied.  He showed up at the police station eleven days after the children were removed to speak with Roby and Newton.[2]  Before the interview, Michael received and waived his *Miranda* rights orally and in writing.

---

[1]This opinion adopts the children's pseudonyms from the Kentucky Supreme Court's opinion.  *Michael*, 2013 WL 1188052, at *1 nn.1–2.

[2]In the second interview, Michael spoke with Detective Roby and Detective Lynn Davis.  We hereafter refer to Roby, Newton, and Davis as "officers."

The questioning started at 8:55 AM and lasted two hours. In the interview, Roby mentioned the North Carolina investigation into Michael's alleged sexual misconduct with Dorothy. About 29 minutes into the interview, Roby asked whether Michael had touched Dorothy "in her private area, in her vagina area." (R. 38-1, First Interview, PageID 296.) He initially responded, "No ma'am." (R. 38-1, First Interview, PageID 296.) But five minutes later, he admitted to touching "between [Dorothy's] legs and in her vagina area." (R. 38-1, First Interview, PageID 299.)

He explained that it had "happened a few times" when he was putting her to sleep. (R. 38-1, First Interview, PageID 299.) And a few minutes later, he admitted that by "a few times" he meant that he had made inappropriate sexual contact with Dorothy three times. For the next hour of the interview, Roby and Newton asked him how often he had been alone with the girls and about his behavior toward them.

In response, Michael denied that Dorothy had ever touched his penis. The officers also asked about two incidents when Michael had hit Joy, once knocking out her teeth. Michael acknowledged these incidents.

The officers also asked how Dorothy knew how to "pose sexually." (R. 38-1, First Interview, PageID 319.) Michael admitted to watching pornography but denied that he had anything to do with Dorothy's behavior. Along those lines, he denied watching child pornography.

Newton pressed Michael on the fact that Dorothy and Francis had been "acting out on each other sexually, they can't even take a bath together for the things they do to each other. It's not natural, for [Dorothy] being a five year old, it's not." (R. 38-1, First Interview, PageID 322.) And Roby followed with, "When they're going to sleep, they want to take anybody's hand and put it between their legs on their vagina. That came from you." (R. 38-1, First Interview, PageID 322.)

But Michael didn't admit that he had caused these behaviors. Instead, he only responded, "I've told you everything that I've done." (R. 38-1, First Interview, PageID 322.) And a few seconds later, "I really regret having done that," and "I want to do everything I can do to fix what

I've done." (R. 38-1, First Interview, PageID 322.)  When the officers told him that they knew that he had done more than he had admitted to, he said, "I came in here to get help and to show you that I'm not running from this case and that I want to work with you all."  (R. 38-1, First Interview, PageID 323.)

Then came the *first* statement that the Kentucky Supreme Court would later call coercive. Roby said, "Okay.  Well obviously you're not telling me anything.  You're the one that [is] going to live with that on your conscious [sic], not me, no[t] [Newton].  As of right now you're not allowed to be around any other children, okay?"[3]  (R. 38-1, First Interview, PageID 323.) And Michael responded, "Yeah." (R. 38-1, First Interview, PageID 323.)

The officers asked if Michael had any questions.  He asked how the kids were doing. After Newton explained that the children were doing "remarkably well" in foster care, Roby made the *second* of the four statements that the Kentucky Supreme Court considered coercive: "You're going to continue to not have any contact with your children just until you admit to everything, you're not to have contact with your children."  (R. 38-1, First Interview, PageID 324.)

Continuing along this line, Roby and Newton explained that Francis had spoken with them "a lot" about what Michael had done because she "didn't have to worry about [Michael] doing anything to" her while she was in foster care.  (R. 38-1, First Interview, PageID 324–25.) And the officers said that they would "talk with Joy[.]"  (R. 38-1, First Interview, PageID 325.) Michael still didn't confess to anything else.

Newton then made the *third* statement that the Kentucky Supreme Court called coercive:

> You know before you ever, ever get to see these kids you'll have to complete a sex abuse assessment treatment program and if you're not honest with them, you'll never complete that and you'll never get to see them and I'll make sure of that.  So until you can sit here and you can tell us what really happened, nobody

---

[3]The Kentucky Supreme Court's transcription was a little bit different: "As of right now, you are not allowed to be around *any of the children*."  (R. 41, Magistrate Judge's R&R, p. 3 n.3 (emphasis added).)  This difference is not consequential to our analysis.

here is going to get help, no one, and especially those little girls and you won't get
to see them.

(R. 38-1, First Interview, PageID 325.)

Roby said, "Its [sic] your choice." (R. 38-1, First Interview, PageID 325.) Newton reiterated that Dorothy and Francis "fondle[d] each other all the time in the bathtub" and that Dorothy was "not going to lie about what she ha[d] seen [Michael] do, she can't make that up. She's 5." (R. 38-1, First Interview, PageID 325.) And Roby chimed in, "She's not going to lie about what you have done to her either." (R. 38-1, First Interview, PageID 325.)

That's when Michael said, "Okay. As far as I know, what she said is true, that's silly." (R. 38-1, First Interview, PageID 325.) About two minutes later, he said that Dorothy "may have kissed" his penis. (R. 38-1, First Interview, PageID 326.) With that admission, the officers asked more questions. But Michael said that he would prefer to discuss these matters "in a more professional setting, like in a sexual abuse place[.]" (R. 38-1, First Interview, PageID 326.)

To that, Roby responded that he needed to get everything "off [his] chest[.]" (R. 38-1, First Interview, PageID 326.) So Michael explained that Dorothy had touched his penis the first time that he had engaged in inappropriate sexual contact with her. Michael then admitted that Dorothy had touched his penis "with her hands and with her mouth." (R. 38-1, First Interview, PageID 326.) He said that only happened once.

Then Newton left the room. She left because Michael said that he'd "like to talk to a therapist or something other than social services." (R. 38-1, First Interview, PageID 328.) But even though Newton was gone, Roby didn't stop asking questions. She kept returning to Michael's sexual contact with Dorothy. But he only further admitted that his penis "brushed up against her vagina" while he engaged in the first instance of sexual misconduct with her. (R. 38-1, First Interview, PageID 330.)

Michael didn't confess to more. So Roby made the *fourth* statement considered coercive by the Kentucky Supreme Court: "You're going to continue the rest your [sic] life without seeing your children, because you want to bottle this up and you're too embarrassed . . . and you

just want to throw your time away with your children for the rest of your life because you don't want to talk about something." (R. 38-1, First Interview, PageID 331.)

Michael stuck to this story: "I've told you everything." (R. 38-1, First Interview, PageID 332.) And Roby ended the interview. So Michael left the police station. But not for long.

Michael went to Joy's house after the interview and told her that he thought he was about to go to jail. And he wasn't wrong. Officers soon arrived and arrested him. And they took him back to the police station. Roby and another officer, Detective Lynn Davis, re-*Mirandized* Michael before launching a second interview. And this time Michael's statements were even more incriminating than those from the first interview.

Michael admitted to at least five acts of sexual abuse: 1) he put his pinky finger against Dorothy's rectum, "perhaps to the point of penetration"; 2) he rubbed his penis against her buttocks; 3) his penis touched her vagina; 4) he ejaculated on Dorothy at least two times; and 5) his penis was in Dorothy's mouth at least once. *Michael*, 2013 WL 1188052, at *2. And he said that his penis may have "slipped into" Dorothy's rectum at least a couple other times. Michael then confirmed his admissions in a written confession.

## II.

A state grand jury returned a multiple-count indictment against Michael, who then moved to suppress all incriminating statements he had made to the officers as coerced under *Miranda v. Arizona*. *See* 384 U.S. 436 (1966). But the state trial court denied the motion to suppress. It held that the statements were voluntary. Michael then pleaded guilty to one count of first-degree sexual abuse and one count of first-degree sodomy. And he was sentenced to 20 years. His guilty plea included a right to appeal the denial of his motion to suppress. He appealed all the way to the Kentucky Supreme Court. *Michael*, 2013 WL 1188052, at *1.

The Kentucky Supreme Court explained that the Fifth-Amendment claim hinged on voluntariness. *Id.* at *2–3. That court evaluated the totality of the circumstances to determine whether any of the officers' statements coerced Michael's confession. *Id.* at *5–6.

The Kentucky Supreme Court agreed four of the officers' statements "were delivered in a threatening manner." *Id.* at *5. And, that court held, the officers' statements that Michael would never see his children again were "made for the sole purpose of coercing a confession." *Id.* But the Kentucky Supreme Court held that the officers' "coercive statements did not induce [Michael's] confession" because Michael "did not make any incriminating statements in response to Roby and Newton's comments[.]" *Id.*

And the Kentucky Supreme Court noted that before the officers made any coercive statements Michael had admitted to touching Dorothy's vagina area three times. *Id.* Importantly, those three occasions constituted *three acts of first-degree sexual abuse*. *Id.* & n.7.

The court looked at other factors in the totality of the circumstances, like Michael's state of mind at the time of the interview, his former occupation, and his education level and intelligence. *Id.* at *5–6. First, Michael was diagnosed with major depressive disorder with psychotic features and alcohol abuse in remission after his arrest, yet the record reflects that he remained calm and exhibited no symptoms during his interview. *Id.* at *5. Second, Michael said that he had consumed wine and had not slept the night before. *Id.* But "there [wa]s no evidence from the recording to corroborate" his claims. *Id.* Plus, Michael had undergone "sleep deprivation training" as a Marine. *Id.* Further, Michael had a high IQ score of 132. That score placed him in the "very superior range" such that the Kentucky Supreme Court thought that he was not "prevent[ed] . . . from understanding the situation he was in." *Id.* at *6. And, finally, Michael "was advised of his *Miranda* rights both orally and in writing before both interrogations. Each time, he indicated that he understood those rights and voluntarily waived them[.]" *Id.*

In sum, the Kentucky Supreme Court upheld the denial of Michael's motion to suppress and affirmed his two convictions for first-degree sodomy and first-degree sexual abuse. *Id.*

## III.

So Michael sought habeas relief as a pro se petitioner in federal district court. He claimed that "[s]tate actors coerced [him] into making incriminating statements by representing that he would be prevented from seeing his children unless and until he confessed to sexual abuse, in violation" of the Fifth, Sixth, and Fourteenth Amendments to the Constitution.

Michael made several arguments, two of which are relevant here. First, Michael argued that the Kentucky Supreme Court made an unreasonable fact determination by saying that Michael had not made "any incriminating statements in response to Roby and Newton's comments." And he separately argued that the Kentucky Supreme Court had misapplied federal constitutional law to determine that his confession was voluntary.

The district court declined to grant relief, rejecting these two arguments. But the district court granted a certificate of appealability on these two issues. Michael timely appealed to us—this time with appointed counsel.

**IV.**

This case begins and ends with the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which governs the habeas petitions of individuals seeking collateral review of federal claims adjudicated in state court. AEDPA provides a "highly deferential standard for evaluating state-court rulings[.]" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). That means we give the state court "the benefit of the doubt." *Id.* (internal citation omitted).

Under AEDPA, when a state court has adjudicated the merits of a habeas petitioner's claim, we review that determination with statutorily prescribed deference. *See* 28 U.S.C. § 2254(d); *English v. Berghuis*, 900 F.3d 804, 811 (6th Cir. 2018). To that end, we won't overturn the state court's decision on collateral review unless it resulted in a decision (1) based on "an unreasonable application" of "clearly established Federal law, as determined by the Supreme Court" or (2) based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In short, AEDPA review is a tough standard to meet. Starting with the first avenue under § 2254(d)—when a state court unreasonably applies Supreme Court precedent—we only grant habeas relief if the petitioner shows that the state court's decision on a federal claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

What's more, even when a state court doesn't give the reasons for its decision, we must consider what "arguments or theories" under federal law could support the decision. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018) (per curiam) (citing *Harrington*, 562 U.S. at 102). And we consider the specificity of the rule of federal law at issue in the case. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In short, a habeas petitioner must hurdle a high bar to show that a state-court decision unreasonably applied clearly established federal law.

Now to the second avenue for habeas relief—when a state court makes an unreasonable determination of the facts. To start, we give state-court factual findings a "presumption of correctness" that may only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). And, under this avenue, we ask "not whether a federal court believes the state court's [factual] determination was incorrect but whether that determination was unreasonable— a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Moreover, even if we decide that the state court made an unreasonable fact determination, that's not enough on its own for us to grant relief. That's because we only grant habeas relief if the state court *based* its decision on that unreasonable fact determination. *Hill v. Shoop*, 11 F.4th 373, 384 (6th Cir. 2021) (en banc) (citing § 2254(d)(2)). Again, a high hurdle for the habeas petitioner.

Michael raises two claims. First, he argues that the Kentucky Supreme Court's denial of his motion to suppress was based on an unreasonable determination of the facts. Second, Michael argues that Supreme Court precedent—*Lynumn v. Illinois*—clearly establishes that his confession was involuntary and therefore inadmissible, even on the Kentucky Supreme Court's facts. *See* 372 U.S. 528, 534 (1963). We'll address each in turn.

**A. Kentucky Supreme Court's Determination of the Facts**

Invoking 28 U.S.C. § 2254(d)(2), Michael first challenges the Kentucky Supreme Court's decision as being based on an unreasonable determination of the facts. A state court's factual

finding is unreasonable if it is rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

To recap, the Kentucky Supreme Court said that Michael "did not make *any* statements in response to the complained-of comments, despite their confession-inducing design, and remained silent following each one." *Michael*, 2013 WL 1188052, at *5. Michael argues that clear and convincing evidence shows that this was an unreasonable fact determination.

Michael points to the timeline of his confession. Ninety minutes into the interview Michael had confessed to three instances of touching Dorothy's vagina but denied that Dorothy had ever touched his penis. That's when Roby said, "You're going to continue to not have any contact with your children just until you admit to everything, you're not to have contact with your children." (R. 38-1, First Interview, PageID 324.) And Newton added that no one would help him unless he confessed.

Two-and-a-half minutes later, after some intervening questions, Michael answered in the affirmative that Dorothy "might have kissed" his penis and that Dorothy "was curious and she touched [his] penis with her hands and with her mouth." (R. 38-1, First Interview, PageID 326.) On that basis, Michael objects to the Kentucky Supreme Court's determination that there was no causal nexus between Roby's statement and Michael's confession.

Here, there is no clear and convincing evidence that the Kentucky Supreme Court got the facts wrong. To be sure, Michael confessed to damning sexual activity with a minor after the statements of Newton and Roby. And one interpretation of the facts is that his confession—two-and-a-half minutes after the officers' coercive statements—responded to the officers' statements.

But that's not the only interpretation. There is another equally plausible view of the facts—the one the Kentucky Supreme Court took. *See Hill*, 11 F.4th at 389 ("But faced with two reasonable interpretations of evidence, we cannot say that the state court's decision to go with one over the other was unreasonable."). Under that view, Michael "did not make *any* statements in response to the complained-of comments, despite their confession-inducing design, and remained silent following each one." *Michael*, 2013 WL 1182052, at *5. In other words,

Michael did not take the officers' coercive bait. Rather, Michael's confessions responded to other comments the officers had made.

The Kentucky Supreme Court's view makes sense. What happened in the two-and-a-half minutes after the coercive statements matters. That's when the officers explained to Michael that Dorothy and Francis acted in a sexual manner toward each other and had given their own accounts of what Michael had done to them. And after hearing this, Michael caved.

So there are two equally plausible versions of the facts. One of them was the Kentucky Supreme Court's. That means there was no unreasonable fact determination here, and we can't overturn the state court's decision. *Rice v. Collins*, 546 U.S. 333, 341–42 (2006) (explaining that when reasonable "minds reviewing the record" might differ on a factual finding we may not overturn a state court's factual findings "on habeas review").[4]

## B. Kentucky Supreme Court's Application of the Law

Second, Michael argues that the Kentucky Supreme Court unreasonably applied *Lynumn v. Illinois*. *See* 372 U.S. at 534. Officers threatened that if Michael did not cooperate he would "continue to not have any contact" with his children. (R. 38-1, First Interview, PageID 324.) Michael argues that this threat, combined with the officers' other statements throughout both interviews, rendered his confession involuntary under *Lynumn*.[5] Michael cites several out-of-circuit, non-Supreme-Court cases supporting his argument. But none of our caselaw (nor the Supreme Court's) suggests that Michael's confession was involuntary.

### 1. Voluntariness Standard Applied to Michael's Case

The Fourteenth Amendment mandates that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. And when officers use interrogation techniques that coerce a confession, "they must be condemned under

---

[4]And Michael hasn't cited a single habeas case where a federal court revisited a state supreme court's fact determination on the basis that a finding on a suspect's responsiveness to interrogation was unreasonable.

[5]Before the Kentucky Supreme Court, Michael abandoned his argument that his confession "was procured in violation of *Miranda v. Arizona*[.]" *Michael*, 2013 WL 1188052, at *2 & n.4. He argued that his confession was involuntary solely under the Fourteenth Amendment. *See id.* at *2.

the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109–10 (1985) ("Indeed, even after holding that the Fifth Amendment privilege against compulsory self-incrimination applies in the context of custodial interrogations . . . and is binding on the States . . . the Court has continued to measure confessions against the requirements of due process."). In short, confessions must be voluntary to withstand Fourteenth Amendment scrutiny.

In *United States v. Mahan*, we said that there are "three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." 190 F.3d 416, 422 (6th Cir. 1999) (citation omitted).

We evaluate the totality of the circumstances in the voluntariness analysis. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973). A defendant is coerced when the totality of the circumstances shows that his will was "overborne and his capacity for self-determination critically impaired[.]" *Id.* at 225. We look at the "age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006) (citing *Schneckloth*, 412 U.S. at 226).

Key here, "[a] confession is much more likely to be voluntary when it is given after a person knowingly and voluntarily waives his *Miranda* rights." *Id.* at 721. And when law enforcement has complied with *Miranda*, we "rare[ly]" hold that a defendant was induced to make a coercive statement. *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

Of course, we aren't tasked with making this legal determination in the first instance here. On habeas review, we must ask whether the Kentucky Supreme Court unreasonably applied Supreme Court precedent on voluntariness. *See Harrington*, 562 U.S. at 103. And if there is room for "fairminded disagreement," we may not disturb the Kentucky Supreme Court's decision. *Id.*

To that end, Michael argues that the Kentucky Supreme Court unreasonably applied *Lynumn*, a pre-*Miranda* case, to determine that Michael's confession was voluntary. In *Lynumn*, the Supreme Court held that a suspect's confession was coerced after officers threatened that "she would be sent to jail, her state financial aid would be cut off, and her children would be taken away." *Loza v. Mitchell*, 766 F.3d 466, 479 (6th Cir. 2014) (citing *Lynumn*, 372 U.S. at 533).

Michael says that *Lynumn* solves this case. That's because, he argues, the facts in his case are worse than the facts in *Lynumn*. On that basis, he says that a fortiori his confession was coerced. We disagree.

Start with the facts. Lynumn was a widow raising her children in 1960s Chicago. *Lynumn*, 372 U.S. at 531. And she relied on state aid to raise her children. *Id.* at 533. After officers set her up in a drug buy, she was seized outside her apartment. *Id.* at 529 n.1. Three officers then forced her into her own apartment, and along with a twice-convicted felon, surrounded her. *Id.* at 530 & n.2. Lynumn had "no friend or adviser to whom she might turn." *Id.* at 534.

That's when officers threatened to take her children away and to make her ineligible for state aid if she did not confess to drug possession. *Id.* at 533. Lynumn "had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats." *Id.* at 534. What's more, she received nothing like a *Miranda* warning. So she confessed. *Id.* And she confessed out of fear that she would lose her children. *Id.* Under those conditions, the Supreme Court held that Lynumn's "will was overborne" at the time of her confession because it was not "the product of a rational intellect and a free will." *Id.* (citation omitted).

But that's not Michael's case. Michael scheduled and attended the first interview with the officers at the police station. And even in his second interview after arrest, he was not ambushed in a surprise raid, like Lynumn was. Two officers interviewed Michael both times, but he wasn't surrounded by officers and a felon, like Lynumn was. And Michael was not new

to state officials asking about his children, like Lynumn was.  In fact, he had encountered child protective services in North Carolina, where he had been advised to stay away from his children.

And on top of these differences, there's an elephant in the room: *Miranda*. *See* 384 U.S. at 478–79.  Lynumn never got *Miranda*.  Michael did.  And he doesn't contest his waiver of *Miranda*.  Applying the voluntariness standard, today we must start from the proposition that when a suspect receives *Miranda* warnings it is "rare" that his confession will be deemed coerced.  *Berkemer*, 468 U.S. at 433 n.20.

In line with Supreme Court precedent, the Kentucky Supreme Court noted that Michael had received *Miranda* warnings "both orally and in writing" before both interviews.[6]  *Michael*, 2013 WL 1188052, at *6.  The Kentucky Supreme Court explained that Michael "exercised his right to 'not answer any questions or make any statements' at least four times—after each of the four complained-of statements." *Id.*

We can't say that the Kentucky Supreme Court unreasonably applied *Lynumn*.  Best case scenario for Michael, there could be fairminded disagreement on whether the officers' coercive statements induced Michael's most incriminating confessions.  But we can't grant a habeas petition on the basis of "fairminded disagreement." *Harrington*, 562 U.S. at 103.

And even if the Kentucky Supreme Court had misapplied *Lynumn* (it didn't), we'd still have to look at all the other factors that inform the totality-of-the-circumstances analysis for voluntariness before overturning its decision.  That's because *Lynumn*'s jurisprudence on threats to take away one's children informs our analysis.  But it's not the only consideration.

Under *Mahan*, even if we take the Kentucky Supreme Court's word that the officers' statements were coercive, they weren't coercive enough "to overbear [Michael's] will." *Mahan*, 190 F.3d at 422.  Nor were the officers' statements "the crucial motivating factor in [Michael's]

---

[6]His waiver read:  "I *Charles F. Michael* have had the above statements of my rights read and explained to me and fully understand them.  I hereby waive these rights and wish to answer any questions or make any statements to officer *Det. Barbara Roby* of the Bardstown Police Department.  I do this freely and voluntarily, without threat or any promises of any kind." *Michael*, 2013 WL 1188052, at *6.

decision to offer the statement." *Id.* We know this because all the other circumstances point in the direction that Michael's confession was voluntary.

From the beginning, Michael waived his *Miranda* rights orally and in writing. And he is a former Marine with a high IQ. *Michael*, 2013 WL 1188052, at *5–6; *see McCalvin*, 444 F.3d at 719–20. He admitted to three acts of first-degree sexual abuse before any of the officers' coercive statements. *Michael*, 2013 WL 1188052 at *5 n.7. Further, the officers asked other questions and informed Michael about how the children behaved sexually toward each other before Michael acknowledged the truth of any of the officers' accusations. *See id.* at *5. And there is no evidence that Michael was physically impaired, despite his arguments to the contrary. He told Roby that he had not "consumed any alcohol or drugs in the twenty-four hour period prior to his interrogation." *Id.* What's more, he said he came to "work" with the officers, suggesting that his motivation to confess was not police coercion but rather his desire to cooperate. (R. 38-1, First Interview, PageID 323.)

In short, the Kentucky Supreme Court applied the totality-of-the-circumstances test with factors that the Supreme Court has laid out. It determined that Michael's confession was voluntary. And it was not unreasonable in doing so.

### 2. Michael's Counterarguments

Michael launches several counterarguments for why his case is the same as—and even worse than—Lynumn's and why we should therefore grant his habeas petition. First, Michael says that the threats in his case were even worse than those in *Lynumn* because they "were exceptionally credible." (Appellant's Br. at 29.) That is, Roby and Newton had seized the children in Michael's case, unlike in *Lynumn*, which lent credibility to the officers' threats that they would take away the children forever. (Appellant's Br. at 30.)

Roby and Newton had taken Michael's children after receiving credible allegations of sexual abuse. The children had been in state custody for eleven days when Michael decided to interview. But Michael hadn't been living with the children even before they entered foster care,

which casts doubt on how coercive the officers' threats were as a threshold matter.**7**  Setting that aside, it's true that the children in *Lynumn* were still in Lynumn's custody at the time of arrest. But that fact doesn't change our analysis.

In Michael's case, it wasn't the "exceptionally credible" threats, but what came after those threats, that *induced* Michael to speak—or at least, that's a plausible reading of the record on which the Kentucky Supreme Court could have relied.  In *Lynumn*, officers didn't follow up their threats with graphic detail of how Lynumn's children described sexual abuse at her hands. But that's what happened in Michael's case.

After Newton's threat, Roby added, "It[']s your choice."  (R. 38-1, First Interview, PageID 325.)  Newton then explained that the children "fondle each other all the time in the bathtub, they do not keep their hands off of each other, that's not normal.  [Dorothy] is 5.  [S]he is not going to lie about what she has seen you do, she can't make that up.  She's 5."  (R. 38-1, First Interview, PageID 325.)  Roby chimed in, "She's not going to lie about what you have done to her either."  (R. 38-1, First Interview, PageID 325.)

And that's when Michael admitted:  "Okay. As far as I know, what she said is true, that's silly."  (R. 38-1, First Interview, PageID 325.)

So, even if Newton's threat was credible, it is plausible that Roby and Newton's explanation of the children's behavior induced a response, not any prior threat.  The Kentucky Supreme Court was not unreasonable in holding that the threats didn't induce a response from Michael.  With that, Michael's "exceptionally credible" threats argument fails.

Next, Michael argues that the threats in his case were more direct than the threats in *Lynumn*.  He argues that in *Lynumn* the officers "subtlety [sic] told the defendant that she had to 'cooperate,'" and still Lynumn's confession was involuntary.  (Appellant's Br. at 31.)  Michael says that his case is worse because, rather than hint, Newton and Roby said that Michael wouldn't see his children again if he didn't confess.

---

**7**As an aside, it's not clear that the officers' threats were any less credible in *Lynumn*.  Lynumn had never encountered law enforcement, and they gave her potential consequences tailored to the marijuana crime they were accusing her of.  372 U.S. at 533.  Just because the officers hadn't taken the children didn't mean they couldn't.

This argument falls flat.  It goes to whether the statements were coercive, not to whether the coercive statements induced a response from Michael.  The Kentucky Supreme Court already said that the officers' threats were coercive.  That is not in dispute.  What is in dispute is whether those coercive threats rendered Michael's confession involuntary.  And, for several reasons, the Kentucky Supreme Court's analysis of the interview is reasonable:  Michael did not immediately say anything after any of Newton's and Roby's threats; his admission that he had touched Dorothy's vagina three times (which constitutes three acts of first-degree sexual abuse in Kentucky) occurred before any of the supposedly coercive statements; and Michael's worst confessions came, unprompted by any coercive threat, in the second interview, after he had completed the first interview, been arrested, and been given *Miranda* warnings a second time. *Michael*, 2013 WL 1188052, at *5; *see United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015) (explaining that "[f]or a defendant's confession to be involuntary, and therefore obtained in violation of the Fifth Amendment, 'coercive police activity' must have preceded the confession" (citation omitted)).  So even if the threats were direct, Michael demonstrated that his will was not overborne in his initial interview.   And his second interview contained no coercive threats.  So this argument is unavailing too.

Third, Michael homes in on the fact that he hadn't seen his children for eleven days at the time of the interview.  He says that he was in "emotional pain" and experienced "disorientation" during the interview.  (Appellant's Br. at 31.)  Michael contrasts his "vulnerable state" with Lynumn's position.  (Appellant's Br. at 32.)  He says that even Lynumn was in a less vulnerable position because the interrogating officers "did not even know that [Lynumn] had children when they arrested her."  (Appellant's Br. at 32.)

But the record belies this argument.   Michael remained calm and collected in both interviews.  He explained that he came "to work with" the officers.  (R. 38-1, First Interview, PageID 323.)  He never showed emotional agitation or disorientation.  And after the interview he told Joy that he was "probably going to jail."  (R. 17-2, Trial Court Suppression Decision, p. 4.) In other words, any discomfort Michael may have experienced does not appear to have overborne his will.  And even if there were a colorable argument that he was uncomfortable, it's not strong enough for us to disturb the Kentucky Supreme Court's decision.

Fourth, Michael points to Newton's statement that "until you can sit here and you can tell us what really happened, nobody here is going to get help, no one, and especially those little girls and you won't get to see them." (R. 38-1, First Interview, PageID 325.) He says that this statement is "a direct threat to Michael's family members[.]" (Appellant's Br. at 32.) Michael argues that, combined with all the other factors, this statement caused his "will [to be] overborne at the time he confessed[.]" (Appellant's Br. at 34.)

To recap, Newton's full statement at this point was as follows: "You know before you ever, ever get to see these kids you'll have to complete a sex abuse assessment treatment program and if you're not honest with them, you'll never complete that and you'll never get to see them and I'll make sure of that. So until you can sit here and you can tell us what really happened, nobody here is going to get help, no one, and especially those little girls and you won't get to see them." (R. 38-1, First Interview, PageID 325.)

The Kentucky Supreme Court never said that Newton's statement was a threat toward Michael's children. And that makes sense. The officers were affirmatively helping Michael's children. They had placed the children in foster care and were investigating a credible threat of sexual abuse. So the Kentucky Supreme Court could have reasonably concluded that Newton was not threatening Michael's children. *See Sexton*, 138 S. Ct. at 2558 (citing *Harrington*, 562 U.S. at 102). And even if that part of the statement was coercive, under *Mahan*, we can't say that it was so coercive that it overbore Michael's will based on the totality of the circumstances, as we've explained above. 190 F.3d at 422. So we won't disturb the Kentucky Supreme Court's decision based on this fourth argument either.

On a final note, even if we added up all Michael's arguments, they still wouldn't lead us to vacate Michael's conviction. That's because the evidence is overwhelming that Michael's confession was voluntary. *See McCalvin*, 444 F.3d at 719–20 (declining to hold that a confession was involuntary in similar circumstances).

## V.

Because we may only overturn a state-court decision when it has unreasonably applied the facts or the law, we affirm the district court's denial of Michael's petition.

**AFFIRMED**.