RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0055p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

                *Plaintiff-Appellant*,

*v.*

RONALD LEE JACOBS,

                *Defendant-Appellee*.

No. 22-3488

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:21-cr-00053-1—Algenon L. Marbley, Chief District Judge.

Argued: March 16, 2023

Decided and Filed: March 28, 2023

Before: McKEAGUE, THAPAR, and LARSEN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mary Beth Young, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellant. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Mary Beth Young, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellant. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellee.

_____

## OPINION

_____

THAPAR, Circuit Judge. When Ronald Lee Jacobs learned there was a warrant out for his arrest, he voluntarily went to the police station. There, an officer questioned him in a manner

consistent with due process, and Jacobs confessed.  The district court suppressed his confession. We reverse.

I.

One October evening in 2020, a man walked into a Walgreens in Columbus, Ohio.  He was wearing dark clothes, and his pants and shoes had white stains on them.  The man placed a pack of gum on the counter and asked the clerk for cigarettes.  When the clerk requested identification, the man reached into his pocket and pulled out what looked like a handgun wrapped in a blue bandana.  After demanding the cash from the register, the man fled with the money and the cigarettes.  He might have gotten away with it—after all, a man of similar description had gotten away with about a dozen armed robberies in the area over the preceding months.  But the robber made a crucial mistake:  he left the pack of gum.

When the police tested the gum, they found Ronald Lee Jacobs's fingerprint on it.  So they got an arrest warrant for him.  When Jacobs learned of the warrant, he voluntarily went to the police station and met with Detective Todd Agee.

After asking a few questions about Jacobs's background, Detective Agee read him his *Miranda* rights, and Jacobs certified that he understood them.  Detective Agee then questioned Jacobs about the Walgreens robbery and the other robberies, showing him pictures from the crime scenes.  Detective Agee pointed out that the stains on the robber's clothes in some of the pictures looked like stains presently on Jacobs's jacket.  Detective Agee also told Jacobs that his fingerprint was found on the pack of gum.

When Jacobs denied involvement in the robberies, Detective Agee highlighted the strength of the fingerprint evidence against him.  Detective Agee also said that he had a warrant written up to search Jacobs's dad's house, where he was living at the time, as well as Jacobs's car.  If needed, Detective Agee emphasized, he'd look until he found the clothes the robber wore and the guns he used:

> I'll get a search warrant signed, and I'll go over to your dad's house, and I will dump everything in that house out looking for those clothes . . . .  And I'm going to take that jacket because [the stains on it] match[ the stains on the robber's clothes]. . . . [T]his is not a threat.  This is not me saying something.  This is what

I am going to do because I have to find that evidence. I've got to find those guns. And I'll do a search warrant on your dad's house because that's where you're staying, and I'll look for it. And I'll toss the whole place until I find my evidence.

R. 53-1, Pg. ID 392–93. Finally, Detective Agee said that Jacobs would likely face a severe sentence given the number of robberies, the strength of the evidence, and Jacobs's denial of responsibility. But, Detective Agee said, things might be different if Jacobs "want[ed] to change [his] story." *Id.* at 394. Jacobs then made his first incriminating statement: "Just a minute. The weapons—them is gone." *Id.* at 395.

After that, Detective Agee offered to let Jacobs "think about it," and he left him alone for a few minutes. *Id.* Jacobs asked to call his mother and his girlfriend. At first, Detective Agee declined, but when Jacobs asked again, Detective Agee offered to let him use Detective Agee's own phone. He also offered to bring Jacobs anything he needed to eat or drink. Jacobs requested water, which Detective Agee provided.

After the break, Jacobs made several other incriminating statements. He said he "f—ed up bad" because he was "broke" and needed the money for child-support payments. *Id.* at 397. He told Detective Agee that he covered up the shotgun seen in some of the pictures because it was "too big." *Id.* at 399. And he explained that the parcel that looked like a handgun at the Walgreens wasn't a gun at all, just "sh— wrapped up [to] look[] like that." *Id.* at 400. He also admitted that he "got rid of" the shotgun and the gloves he used in some of the robberies. *Id.* at 403, 405. Finally, Jacobs worked with Detective Agee to help police retrieve the clothes he wore during the crimes from his girlfriend's house. All told, the interview lasted a little less than two hours.

Ahead of trial, Jacobs moved to suppress the incriminating statements he made during his interview. The district court granted the motion, concluding that Detective Agee used tactics in the interview that were impermissibly coercive, thereby rendering Jacobs's statements

involuntary.  The government timely filed this interlocutory appeal challenging the suppression order.[1]  *See* 18 U.S.C. § 3731.

## II.

## A.

Courts have long condemned the coercion of confessions.  *Miller v. Fenton*, 474 U.S. 104, 109 (1985).  When a defendant claims that his confession was coerced, to avoid suppression the government must show by a preponderance of the evidence that the confession was voluntary.  *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).  But courts don't infer coercion lightly.

Police action is only coercive when it "overbear[s] the accused's will to resist." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).  That requires that three things be true:  "(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear [the] defendant's will; and (3) [the] defendant's will was, in fact, overborne as a result of the coercive police activity."  *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991) (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

On appeal, we apply each prong of the coercion test anew, determining for ourselves the legal significance of the facts.  *See United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992); *see also Miller*, 474 U.S. at 110 (noting that the voluntariness issue is a legal one, not a factual one). So although we rely on the district court's factual findings "concerning specific events surrounding the confession" unless they are clearly erroneous, we independently examine how those events affect the voluntariness analysis.  *Wrice*, 954 F.2d at 410–11; *Rigsby*, 943 F.2d at 635.

---

[1]In his response brief, Jacobs argues that we should not only affirm the suppression order but extend its reach to the evidence Detective Agee obtained from Jacobs's girlfriend following the interview.  But Jacobs hasn't cross-appealed challenging the suppression order, which denied suppression of that evidence.  Nor could he.  Our jurisdiction over this case comes from 18 U.S.C. § 3731, which grants jurisdiction only over government appeals of suppression orders.  *See* Appellee Br. at 1 (agreeing that our jurisdiction over this appeal derives only from Section 3731).  Thus, we cannot consider Jacobs's challenge.

Since none of the three conditions for coercion is met here, Jacobs's confession was voluntary.

First, Detective Agee didn't engage in any objectively coercive conduct. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary." (internal quotation marks omitted)). Detective Agee's conduct closely resembles conduct we've previously held is not coercive. He spoke throughout in a conversational tone, offered Jacobs food and drink, never brandished a weapon or handcuffs, and did not threaten or use violence. *See, e.g.*, *United States v. Luck*, 852 F.3d 615, 623 (6th Cir. 2017) ("[Officers] spoke in conversational tones, did not threaten defendant or yell at him, and told him he did not have to provide a statement if he did not want to. Defendant was not arrested or otherwise prevented from leaving the agents' presence."). The interview was also relatively short. *Id.* True, Detective Agee did warn that he'd obtain a warrant to search Jacobs's father's house and Jacobs's car. But a threat to perform a lawful search isn't objectively coercive. *See United States v. Johnson*, 351 F.3d 254, 261–63 (6th Cir. 2003). And all agree that Detective Agee could have lawfully searched the house and car.[2]

Second, Detective Agee's conduct wasn't sufficient to overbear Jacobs's will. For one thing, Jacobs received a properly issued *Miranda* warning. Such warnings "ensure that the police do not coerce or trick captive suspects into confessing." *Berkemer v. McCarty*, 468 U.S. 420, 433 (1984). So the issuance of a *Miranda* warning makes it less likely that police conduct will overbear a suspect's will. *Id.* at 433 n.20; *see also Michael v. Butts*, 59 F.4th 219, 229 (6th Cir. 2023). And for another, Jacobs is sophisticated enough that Detective Agee's conduct wouldn't have overborne his will. Unsurprisingly, the more intelligent, mature, experienced, or educated the suspect is, the more likely he is to be able to resist pressure during an interrogation. *See Mahan*, 190 F.3d at 422–23. And here, Jacobs had previous experience with the criminal-

---

[2]As *Johnson* explains, this doesn't mean that police officers can flippantly threaten suspects or their family members every time they wish to obtain a confession. Indeed, threats, when they're not backed up by the officer's lawful authority, may be improper. *Johnson*, 351 F.3d at 262–63. So though Detective Agee could threaten to search Jacobs's father's house, he couldn't threaten to, for instance, arrest and prosecute Jacobs's father without probable cause.

justice system,**[3]** was forty-three years old, had two years of college education, and wasn't drunk or otherwise impaired. All these factors plus the *Miranda* warning indicate that Detective Agee's questioning didn't overcome Jacobs's will.

Third, the timeline and substance of the interview suggest that Jacobs confessed because of the strength of the evidence against him and the prospect of a long sentence—not because of any coercive conduct. Before Jacobs made any incriminating statements, Detective Agee walked Jacobs through the roughly dozen robberies he was suspected of and outlined the evidence against Jacobs. Many of Jacobs's statements came immediately after Detective Agee reiterated the severity of these crimes and the strength of the evidence. For instance, Jacobs made his first incriminating statement ("the weapons—them is gone") right after Detective Agee discussed the likelihood of a severe sentence. R. 53-1, Pg. ID 395. Once Detective Agee highlighted how compelling the fingerprint evidence was ("[o]nce we got those prints, we had everything"), Jacobs said, "I f—ed up bad." *Id.* at 396–97. And after Detective Agee again listed several of the robberies and asked which Jacobs remembered, Jacobs said "I know I got real bad . . . I f—ed up so bad." *Id.* at 402. All these facts suggest that Jacobs's incriminating statements were not the result of police coercion, but instead attempts to mitigate the damage once he realized he couldn't avoid responsibility for his crimes.

Since none of the three prongs of the voluntariness test was met here, Jacobs's statements weren't improperly coerced.

### B.

Jacobs responds that Detective Agee's threat to obtain a search warrant for his father's house was so coercive as to render his statements involuntary. Specifically, Jacobs points to two phrases Detective Agee used—"I will dump everything in that house out" and "I'll toss the

---

**[3]**The district court said that Jacobs's prior experience with the criminal-justice system made it more likely that his statements were coerced. But prior experience with the criminal-justice system counsels *against* a finding of coercion, not in favor of it. *See, e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (listing lack of experience with the criminal-justice system as a factor cutting in favor of coercion); *Ledbetter*, 35 F.3d at 1070 (weighing prior experience with the criminal-justice system against coercion). That's because suspects with a history of dealing with the police are more likely to understand when police are deceiving them or exaggerating than those with no prior police contacts.

whole place." *Id.* at 393. Jacobs argues that those statements rendered the warrant threat coercive. But Jacobs's reliance on those statements fails for two reasons.

First, the words Detective Agee used, although forceful, refer to a search, not "wanton destruction of property." R. 106, Pg. ID 949. In its suppression order, the district court recast Detective Agee's statements as threats to "ransack[]" and "destroy" the home. *Id.* at 950–51. And during the suppression hearing, the court used the same language. It also referred to Detective Agee's threat to "take everything out of [his] home and throw it outside." R. 116, Pg. ID 1247. Jacobs's brief on appeal uses similar language. But to the extent the district court found that Detective Agee made statements to that effect, it clearly erred: Detective Agee never said he would "ransack" or "destroy" the house or that he would "throw [everything] outside." *See Wrice*, 954 F.2d at 410–11. So whether statements of that sort would be coercive is not an issue before us. As it is, threatening a thorough but lawful search—even inartfully—is not by itself impermissible.[4] *See Johnson*, 351 F.3d at 262–63.

Second, the circumstances surrounding Detective Agee's statements also cut against coercion. Courts must consider the totality of the circumstances surrounding alleged coercion, not hunt for words they find objectionable. *See Wrice*, 954 F.2d at 411. And for good reason. Officers must often obtain information "from uncooperative individuals" under less-than-ideal circumstances. *Johnson*, 351 F. 3d at 261 (quotation omitted); *see also New York v. Quarles*, 467 U.S. 649, 657 (1984). The video of the interview reveals that Detective Agee spoke with a calm demeanor throughout the questioning. And the rest of his discussion of the warrant indicates he only intended to conduct a lawful search to collect specific evidence. For example, the language immediately after the language Jacobs objects to suggests a limited search: Detective Agee said he'd "dump everything in that house out *looking for those clothes*." And he'd "toss the whole place *until I find my evidence*." R. 53-1, Pg. ID 393 (emphasis added). Further, Detective Agee made his purpose explicit: "This is what I am going to do because I

---

[4]Jacobs contends that the government forfeited the argument that Detective Agee's statements referred only to a lawful search by failing to present evidence on the issue to district court. But the government presented the interrogation video itself, which is evidence of Detective Agee's words, their context, and their tone. And it argued below that this was simply "an inartful way of saying executing a search warrant." R. 116, Pg. ID 1246. Thus, the government preserved this argument.

have to find that evidence." *Id.* To be sure, tone, volume, and mitigating context aren't dispositive. But here, they all weigh in favor of Detective Agee in the totality-of-the-circumstances analysis. Thus, the interrogation's circumstances further support the conclusion Detective Agee's words naturally suggest: Detective Agee threatened a thorough but limited search of Jacobs's father's home. Viewing the interview from the totality-of-the-circumstances lens, Detective Agee didn't use coercion.

The break that Detective Agee gave Jacobs "to think about it" strengthens this conclusion. *Id.* at 395. The district court considered the break a tactic used to overcome Jacobs's will. But we've never held that a break in an interview can contribute to coercion. On the contrary, the opposite is true: incessant questioning *without* any breaks can support a finding of coercion. *See Spano v. New York*, 360 U.S. 315, 322 (1959).

Similarly, the fact that Detective Agee "denied [Jacobs] an opportunity to contact any of his family members" doesn't change the outcome. *See* R. 106, Pg. ID 948. It's true that in extreme cases, isolating suspects from family members can be coercive. For instance, the Supreme Court held that it was impermissible for police to detain an impoverished, mentally disabled suspect without any contact with friends or relatives for over two weeks until he finally confessed. *Davis v. North Carolina*, 384 U.S. 737 (1966). But this is not one of those extreme cases. The whole interview lasted less than two hours, not two weeks. Jacobs was otherwise comfortable—Detective Agee even offered to bring him food and drink. And Detective Agee *didn't* refuse to let Jacobs contact his family—he offered his own phone for Jacobs to use. If anything, this again weighs against concluding that the interview was coercive.

In sum, Detective Agee didn't employ unlawful coercion when he interviewed Jacobs. His threat to obtain a warrant was lawful, and the phrases Jacobs points to don't change the result, especially when considered in context.

\*          \*          \*

The totality of the circumstances indicates that Jacobs's incriminating statements were voluntary. We reverse the suppression order and remand for further proceedings.